**UNITED STATES of America, Appellee,**

**v.**

**Rhoda OGBERAHA, Kudirat F. Ayinde, Defendants-Appellants.**

**Nos. 971, 972, Dockets 84–1402, 84–1408.**

United States Court of Appeals, Second Circuit.

Argued April 10, 1985.

Decided Aug. 26, 1985.

Dennis E. Milton, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Mary McGowan Davis, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Gary E. Divis, New York City (David H. Gendelman, New York City, of counsel), for defendant-appellant Ogberaha.

Robert L. Weinstein, New York City (Gary E. Divis, New York City, of counsel), for defendant-appellant Ayinde.

Before MANSFIELD, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The sole issue raised on these appeals is whether body cavity searches of the defendants conducted at the border by United States customs officials violated the fourth amendment. Because we agree with the district court that the circumstances in these cases raised "reasonable suspicions", within the meaning of *United States v.*

*Asbury,* 586 F.2d 973 (2d Cir.1978), that defendants were concealing contraband internally, we hold that the searches were reasonable and that defendants' motions to suppress the seized heroin were properly denied. Accordingly, we affirm.

### BACKGROUND

On May 26, 1984, defendants Rhoda Ogberaha and Kudirat Ayinde, two Nigerian nationals traveling separately on the same flight, arrived in New York at John F. Kennedy International Airport from Lagos, Nigeria. After routine interrogation and inspection of her travel documents, each was separately subjected to a body cavity search that revealed a heroin-filled condom concealed in her vagina. Each defendant was. charged in three separate counts with knowingly and intentionally conspiring to import a substantial quantity of heroin hydrochloride in violation of 21 U.S.C. § 963; importing a substantial quantity of heroin hydrochloride in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); and possessing with intent to distribute a substantial quantity of heroin hydrochloride in violation of 21 U.S.C. § 841(a)(1). The charges were included in a single indictment since the conspiracy charge against each defendant charged her with conspiring with another defendant whose case is not before us. Ogberaha and Ayinde were not charged with conspiring with each other.

Upon motion of both defendants the district court held a pretrial suppression hearing to determine the reasonableness of the searches. The inspectors who ordered the searches and the female inspector who performed them testified; neither defendant took the stand. The district court concluded that since the border officials possessed the requisite "reasonable suspicion" of criminal activity within the meaning of *Asbury* to justify the intrusive searches, defendants' fourth amendment rights were not violated. Accordingly, the motions to suppress the physical evidence as "fruits" of an unlawful search were denied.

Defendants waived their right to a jury trial. Upon stipulation of the parties the trial consisted of the transcript and exhibits of the suppression hearing and a stipulation concerning testimony by a Drug Enforcement Administration chemist about the seized narcotics. Judge Bramwell found defendants guilty on all counts and, on November 15, 1984, sentenced Ogberaha to five years imprisonment on each of the three counts, to run concurrently, plus a special parole term of ten years on counts 5 and 6 of the indictment, and Ayinde to treatment and supervision pursuant to the Federal Youth Corrections Act, 18 U.S.C. § 5010(b), on each of the three counts to run concurrently.

### DISCUSSION

*A. General principles.*

■ It is well established that routine border inspections do not violate the fourth amendment prohibition against unreasonable searches even when conducted without probable cause or a warrant. *United States v. Montoya De Hernandez,* — U.S. ——, ——, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985); *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed.2d 543 (1925); *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886). Such searches are reasonable "simply by virtue of the fact that they occur at the border", *Ramsey,* 431 U.S. at 616, 97 S.Ct. at 1978, and are authorized "in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya De Hernandez,* — U.S. at ——, 105 S.Ct. at 3309. Even at the border, however, an intrusive body search is justified only if the border official can articulate facts "based upon something more than the border crossing" that raise the suspicion of illegal concealment. *Asbury,* 586 F.2d at 975. The reasonableness of such a search is determined by balancing the legitimate governmental interests against the offensiveness of the intrusion. *Montoya De Hernandez,* — U.S. at ——, 105 S.Ct. at 3308–09.

■ To justify a strip search conducted at the border the circumstances must warrant a "reasonable suspicion" that the party to be searched is guilty of illegal concealment. *Asbury*, 586 F.2d at 976. Appellants argue that the even greater intrusion and indignity of a body cavity search, which involves an "intrusion beyond the body's surface", *Rivas v. United States*, 368 F.2d 703, 710 (9th Cir.1966), *cert. denied*, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967), should require not just a "reasonable suspicion" but a "clear indication" that the person searched is concealing contraband within his body cavity. This "clear indication" standard, as adopted by the ninth circuit, *see, e.g., United States v. Mastberg*, 503 F.2d 465, 471 (9th Cir.1974), defines a level of suspicion falling somewhere between "reasonable suspicion" and "probable cause". *Montoya De Hernandez*, — U.S. at —, 105 S.Ct. at 3310.

However, the ninth circuit's use of a "clear indication" standard in the context of a border detention case was recently rejected in *Montoya De Hernandez* where the Supreme Court found that the "Fourth Amendment's emphasis upon reasonableness [is not] consistent with the creation of a third verbal standard." *Id.* Although the Court did not address the level of suspicion required to conduct strip or body cavity searches, *id.* — U.S. at — n. 4, 105 S.Ct. at 3311 n. 4, its more general, but firm, rejection of a third verbal standard supports our present refusal to adopt a "clear indication" standard in the context of a body cavity search.

■ We are, of course, aware of and sensitive to the indignity and intrusiveness of body cavity searches, *see Bell v. Wolfish*, 441 U.S. 520, 576–77, 99 S.Ct. 1861, 1893, 60 L.Ed.2d 447 (1979) (Marshall, J., dissenting); *id.* at 594, 99 S.Ct. at 1902 (Stevens, J., dissenting); *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 208 (2d Cir.1984). But the "subtle verbal gradations" that appellants urge us to adopt "may obscure rather than elucidate the meaning" of the fourth amendment. *Montoya De Hernandez*, —

U.S. at —, 105 S.Ct. at 3311. The reasonable suspicion standard of *Asbury*, is "flexible enough to afford the full measure of protection which the fourth amendment commands." *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

In *Asbury* this court suggested twelve factors pertinent to determining the reasonableness of a border official's suspicions about smuggling, noting, of course, the importance of viewing the totality of the circumstances rather than the presence or absence of a single factor. *Asbury*, 586 F.2d at 977. Those factors relevant to this appeal are (1) excessive nervousness, (2) unusual conduct, (3) loose fitting or bulky clothing, (4) an itinerary suggestive of wrongdoing, and (5) inadequate luggage. *Id.* at 976–77.

■ In determining whether a border entrant's conduct was suspicious, we must consider, *inter alia*, the *Asbury* factors. But we must also remain mindful of the high level of the government's interest in securing the nation's borders, *Montoya De Hernandez*, — U.S. at —, —, 105 S.Ct. at 3309, 3312, and of the "veritable national crisis in law enforcement caused by smuggling of illicit narcotics". *Id.* — U.S. at —, 105 S.Ct. at 3309. We further note our deference to the expertise and "common sense conclusion[s]" of trained customs inspectors, *Montoya De Hernandez*, — U.S. at — — —, 105 S.Ct. at 3311, *quoting, United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), who are well versed in the "smugglers' repertoire of deceptive practices," *Montoya De Hernandez*, — U.S. at —, 105 S.Ct. at 3309, particularly those methods of smuggling that can be detected only by way of the intrusive search at issue here. Guided by these principles we turn to the challenged searches.

B. *The Challenged Searches.*

■ In support of its conclusion that the search of Rhoda Ogberaha was reasonable, the district court found that she (1) trav-

eled from a country that is a drug source (Nigeria) and expected to stay in New York, a place far removed from her homeland, for only a week, (2) carried luggage that customs officials judged to be a small amount for international travel, (3) appeared "nervous and disoriented" upon deplaning, (4) was described as an experienced traveler who purchased her ticket with cash shortly before her departure for this country, and (5) wore loose fitting clothing under which she could have concealed contraband.

The district court also found that like Ogberaha, Ayinde (1) traveled from a source country and planned a short stay in this country, (2) carried what was described as an insufficient amount of luggage for international travel, (3) behaved in a "strange manner" when routinely questioned, and (4) purchased her ticket with cash shortly prior to her departure. In addition, Ayinde carried $2,000 in cash on her person and listed as her destination a hotel known to the customs inspector to be used by persons trafficking in narcotics.

No challenge has been made concerning the basic facts surrounding each examination. In each case, the personal search was carried out by Maria Sullivan, a female customs inspector. Before conducting each examination Sullivan identified herself and explained exactly what was required. Each search was conducted without unnecessary delay in a private examination room in the presence only of Sullivan and the defendant. At no time during the course of either search did Sullivan have any physical contact with either defendant. Instead, each defendant complied with Sullivan's request to remove the condom from her vagina. There is no claim that Sullivan abused the defendants either physically or verbally.

The decisions to conduct the personal searches were made by other customs officers, who had extensive experience in detecting contraband. Inspector Burns, a customs inspector for 13 years, made the decision to require a personal examination of Ogberaha. Burns was a member of the contraband enforcement team at Kennedy Airport, a mobile unit that traveled from terminal to terminal specializing in selecting passengers for intensive examination in order to trap incoming contraband. Burns testified to his experience in detecting narcotics smugglers and noted that Ogberaha was "in an age category that [he] knew of people bringing in heroin". Prior to his ordering the personal examination of Ogberaha he became aware of one other female body cavity smuggler who had been apprehended that morning. Inspector Fasano, the customs inspector who requested that a personal examination of Ayinde be performed, had senior inspector Burns approve the request before turning Ayinde over to Sullivan for the search. Fasano testified that prior to commencing his tour of duty he was aware of two similar seizures made from passengers on the same flight.

Given the trial judge's superior position to assess witness credibility, his obvious credit of the customs officers' testimony, and the absence of any serious dispute over the basic facts, we cannot say in this case that the district judge's findings of fact were clearly erroneous or that he erred in concluding that the circumstances raised the requisite reasonable suspicion. We note the presence in each case of at least four of the *Asbury* factors, as well as the experience precisely of the customs officers in detecting this type of smuggling. According to Inspector Sullivan at least four body cavity smugglers (including the defendants) were successfully apprehended from the same flight. It would not be surprising for smugglers to put several couriers on a single flight in order to increase the possibility of successfully introducing a certain amount of a high-value contraband, such as heroin; the failure of some couriers would simply amount to a "cost of doing business" readily offset by the high profits earned by the successful ones.

There was no evidence to suggest that the government agents engaged in any discriminatory or arbitrary behavior, such as subjecting all Nigerian women to greater scrutiny

simply because they were Nigerian citizens. Indeed, Inspector Sullivan testified that such a sweeping search would have been impossible because of time pressure. Moreover, the searches were performed as discreetly as possible by a female inspector in a private examination room. There is no indication that the government made the events any more demeaning or intrusive than was essential to the agents' performance of their duty; discovery and seizure of internally concealed contraband of whose existence they had reasonable suspicions.

In sum, we find no improper conduct here on the part of the government, and we agree with the district court that the circumstances surrounding both defendants' entry into this country raised a reasonable suspicion of internal concealment that justified the searches performed.

Affirmed.