Ann WEBER and Gary J. Weber, Plaintiffs,

v.

Elizabeth DELL, Officer Janssen Rembert, Investigator Michael Ciminelli, Sgt. R. Hare, Officer Sue Shannon, Officers John Doe, Jane Doe and other unidentified police officers, the City of Rochester Police Department, the City of Rochester and the County of Monroe, and Andrew P. Meloni, Monroe County Sheriff, Defendants.

No. CIV–84–1041T.

United States District Court, W.D. New York.

March 11, 1986.

Faraci, Guadagnino, Lange & Johns (Stephen G. Schwarz, of counsel), Rochester, N.Y., for plaintiffs.

Monroe Co. Atty. (Nira T. Kermisch, Asst. Co. Atty., of counsel), Louis N. Kash, Corp. Counsel for the City of Rochester (Michele DiGaetano, Asst. Corp. Counsel, of counsel), Rochester, N.Y., for defendants.

## DECISION and ORDER

TELESCA, District Judge.

This is an action brought by plaintiffs against the City of Rochester, several of its police officers and one of its police dispatchers, for injuries arising out of their arrest. Plaintiffs also seek damages from the County of Monroe and its Sheriff, Andrew Meloni for the alleged violation of plaintiff Ann Weber's constitutional rights as a result of her being forced to undergo an illegal strip search and body cavity search at the Monroe County Jail on June 19, 1983. Pending before me are motions

by the County and the Sheriff for summary judgment, and a cross-motion by the plaintiffs for partial summary judgment against those defendants. I hold that the plaintiffs' constitutional rights were not violated by the County or the Sheriff as claimed, and therefore grant the County's and the Sheriff's motions for summary judgment and deny the plaintiffs' cross-motion for partial summary judgment.

## FACTS

For purposes of this motion, I rely upon the following limited description of the facts of the case which are gleaned from the papers and affidavits supplied by the parties. The City of Rochester chose not to participate in these motions presumably because they dealt only with defendants County of Monroe and Sheriff Meloni.

On June 18, 1983 Ann Weber was arrested for charges of resisting arrest and for making a false report of a shooting. Her husband Gary Weber was arrested at the same time and charged with obstruction of governmental administration.[1]

The alleged false report was made in order to induce the police to answer a call for assistance when a previous call reporting an episode of malicious mischief went unanswered. For the purposes of this motion it is relevant to point out only that Mrs. Weber was taken by the police at approximately 3:00 A.M. to the Monroe County lockup where she was placed in a holding cell, then booked.

Earlier that evening Ann Weber's daughter, Marilyn Mogenhan had been married in the City of Rochester. When placed in the lockup, Mrs. Weber was still wearing the formal wedding attire she had worn to her daughter's wedding earlier that evening. After she was booked, she was not taken back to the holding cell where arrestees awaiting bail are normally kept. Instead, apparently because the holding area was full, she was taken to a cell in an area of the Monroe County Jail where arraigned pre-trial detainees are housed.

---

1. Both plaintiffs were later acquitted of all charges after trial in Rochester City Court.

A jail matron then ordered Mrs. Weber to remove all of her clothing. After she did so, she was ordered to alternately face toward and away from the female jailer and bend at the waist. While bending, she was ordered to "spread her cheeks" while the jailer visually inspected her rectal and vaginal areas. After this search, she was placed in a cell for less than 30 minutes until her daughter arrived to post bail. Prior to this episode, she had never been arrested.

After Mr. Weber was booked he was taken to a hospital where he was treated for wounds to his face.

The strip search of Mrs. Weber had been conducted pursuant to a County Jail policy under which any arrestee placed in the County Jail (other than those in the holding area) was strip searched and body cavity searched. The County and the Sheriff claim that this blanket strip/cavity search policy was required by 9 NYCRR § 7502.-1(a), which states that, "Before being placed in a cell or detention room, the clothing and person of each prisoner shall be thoroughly searched." At oral argument, the County attorney conceded that the phrase "thoroughly searched" did not necessarily require a strip/cavity search, but that the County Sheriff had interpreted the regulation in that manner, as had other jail administrators in the State.

Plaintiff originally instituted this action against Elizabeth Dell, the City, the police officers, and Monroe County. After the County moved for summary judgment, in part because New York Constitution Article XIII, § 13 forbids imposing liability upon the County for the acts of the Sheriff (see *Barr v. County of Albany,* 50 N.Y.2d 247, 428 N.Y.S.2d 665, 406 N.E.2d 481 (1980)), plaintiffs moved for leave to add the County Sheriff as a defendant, which leave was granted. The County has renewed its motion for summary judgment based on Article XIII, and also argues that the strip search policy was constitutional, and that (if the policy was not constitutional) the County is nevertheless immune from damage liability because the Sheriff

adopted the policy in good faith reliance upon *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Sheriff has also moved for summary judgment, raising the same arguments raised by the County (except Article XIII). Plaintiffs have cross-moved for partial summary judgment against the County and the Sheriff, relying on cases from several circuit courts of appeals holding that a blanket strip search policy is unconstitutional.

As set forth below, I hold that the strip search policy implemented by the Sheriff is constitutional under the authority of *Bell v. Wolfish* and its progeny, and I grant summary judgment to the County and the Sheriff on that authority.

## DISCUSSION

The plaintiffs in *Bell v. Wolfish* challenged numerous conditions of their confinement at the pre-trial detention facility in New York City and various policies and practices of that institution. The Supreme Court sustained against a Fourth Amendment challenge the practice of conducting routine body cavity searches of these pre-trial detainees following contact visits, even though there had been only one reported attempt to smuggle contraband into the facility in a body cavity. 441 U.S. at 558–60, 99 S.Ct. at 1884–85. Although the Court admitted that the practice of conducting these searches "instinctively [gave it] the most pause," *id.,* it balanced this against the prison's interest in maintaining security, and concluded that this practice did not violate the Fourth Amendment. The balancing test it applied is worth quoting at length:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A deten-

tion facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases. That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

441 U.S. at 559, 99 S.Ct. at 1884–85 (citations omitted).

The Court stated specifically that probable cause was not required before a body cavity search could be conducted on these inmates. 441 U.S. at 560, 99 S.Ct. at 1885. The Court also stated that the existence of less intrusive and equally effective alternatives to body cavity inspections did not render such inspections unconstitutional under the Fourth Amendment, as long as the alternative chosen by the prison administrators was not irrational or unreasonable. 441 U.S. 559, n. 40, 99 S.Ct. at 1884–85, n. 40.

The Court added a gloss to *Bell v. Wolfish* in the 1984 case of *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). *Block* was a Fourteenth Amendment case rather than a Fourth Amendment case, because in *Block* the prison administrators had chosen to ban contact visits entirely, rather than conduct any searches of inmates returning from contact visits. In *Block*, the Court again emphasized that it was unwilling to substitute its judgment on the difficult and sensitive matters of institutional administration and security for that of the persons who were actually charged with and trained in the running of such facilities. 104 S.Ct. at 3233. It took judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country, then reversed the District Court's decision holding that a limited program of contact visits was constitutionally required:

On this record, we must conclude that the District Court simply misperceived the limited scope of judicial inquiry under *Wolfish*. When the District Court found that many factors counseled against contact visits, its inquiry should have ended. The Court's further "balancing" resulted in an impermissible substitution of its view on the proper administration of Central Jail for that of the experienced administrators of that facility. Here, as in *Wolfish*, "[i]t is plain from [the] opinions that the lower court simply disagreed with the judgment of [the jail] officials about the extent of the security interests affected and the means required to further those interests." 441 U.S., at 554, 99 S.Ct., at 1882.

104 S.Ct. 3234.

Regardless of my personal feelings concerning the strip search and cavity search performed in this case and the policy established which led up to that search, I am compelled to follow the direction announced by the Supreme Court in deferring to the judgment of those entrusted with administering the jail, in this case the Sheriff of Monroe County. The Supreme Court has very recently reaffirmed that policy of deference to the decisions of prison administrators on security matters in *Whitley v. Albers*, —— U.S. ——, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The message from the Supreme Court is clear: a district court should not substitute its view on the proper administration of a jail "... for that of the experienced administrators of that facility" simply because the Court may disagree with the "judgment of [the jail] officials ...". *Block v. Rutherford, supra,* 104 S.Ct. at 3234.

Plaintiffs rely on a host of cases from circuit courts other than the Second Circuit (most of which predated *Block v. Rutherford*), in which the balancing test of *Bell v. Wolfish* was applied, and in which the cir-

cuit courts concluded that blanket strip/body cavity searches of all pre-trial detainees were unreasonable. *Tinetti v. Wittke,* 479 F.Supp. 486 (E.D.Wisc.1979), *affd.,* 620 F.2d 160 (7th Cir.1980); *Tikalsky v. City of Chicago,* 687 F.2d 175 (7th Cir. 1982); *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), *cert. denied sub nom. Clements v. Logan,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983); *Stewart v. Lubbock County, Texas,* 767 F.2d 153 (5th Cir.1985), *cert. denied sub nom. Lubbock County v. Stewart,* — U.S. ——, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Levka v. City of Chicago,* 748 F.2d 421 (7th Cir.1984); *Hill v. Bogans,* 735 F.2d 391 (10th Cir.1984); *Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); and *Jones v. Edwards,* 770 F.2d 739 (8th Cir.1985); *see also Dufrin v. Spreen,* 712 F.2d 1084, 1088 (6th Cir.1983).

In all of these cases, the circuit courts refused to condone strip/body cavity searches of *all* arrestees entering a jail. These courts refused to allow searches of misdemeanants (or even felony offenders) unless there was "reasonable suspicion" or other circumstances (such as the nature of the crime with which the arrestee had been charged) which would lead a reasonable prison administrator to suspect that the particular arrestee might be concealing contraband in a body cavity.

After *Bell* and *Block* I cannot adopt the reasoning of these circuit courts. Instead, I am led to the inescapable conclusion that, once a person becomes a prison inmate, he or she loses any Fourth Amendment protection from strip/body cavity searches if prison administrators have reasonable grounds for concluding that the inmate is in a position to be carrying contraband. In this case, County Sheriff Me-

loni testified that it was his experience and that of his deputies that approximately 70% of the arrestees who are strip-searched prior to admission to the County Jail are carrying material that is classified as contraband, either on their clothing or on their persons. Although the Sheriff's figures were only rough estimates, and did not differentiate between items found in the clothing and items found in body cavities, his figures are sufficient to indicate that there is a considerable problem with arrestees carrying contraband. Moreover, in the experience of other courts, *see, e.g., Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884–85; *Mary Beth G. v. City of Chicago, supra,* 723 F.2d at 1272–73, there is indeed a problem with at least *some* arrestees concealing contraband in body cavities. Given that assumption, I cannot, after *Block v. Rutherford,* substitute my view on the proper administration of the County Jail for that of Sheriff Meloni.

Although the balancing test in *Bell v. Wolfish* used words such as "each case," "particular search," and "particular intrusion," the Court evidently was not so much concerned with each individual's search as with the prison's policy of searching a given *group* of inmates (in that case, inmates returning from contact visits). This emphasis is even more evident in *Block v. Rutherford,* in which the Court refused to require prison administrators to differentiate among candidates for contact visitation, identifying those inmates with propensities for violence, escape or drug smuggling.[2] I read these cases as holding that, once I have determined that the Sheriff has properly concluded that a given *group* of inmates (here recent arrestees) poses a threat of smuggling contraband, I must determine that he is justified in searching any *individual* member of that group,

---

**2.** This same distinction (between inmates as a group, instead of individually) is also noted by the First Circuit in its interpretation of *Bell v. Wolfish.* *See Blackburn v. Snow,* 771 F.2d 556, 564–65 (1985).

The First Circuit, *in dicta,* indicates that it considers arrestees merely awaiting bail to have

the same Fourth Amendment rights as prison guards, jail visitors, and other unincarcerated persons. *Id.,* at 565. As is evident from my decision, I disagree, at least when the arrested person must be housed in a cell near other inmates.

even (after *Bell v. Wolfish*) through means as intrusive as a visual body cavity search.

This reading of the cases is supported by Justice Rehnquist, the author of the *Bell v. Wolfish* majority decision, in his decision temporarily restraining the Fourth Circuit from enforcing its *Logan v. Shealy* decision, *supra.* In *Clements v. Logan*, 454 U.S. 1304, 102 S.Ct. 284, 70 L.Ed.2d 461 (1981), Justice Rehnquist described the Fourth Circuit's decision as "so at odds with this Court's resolution of a similar issue in *Bell v. Wolfish*" that the extraordinary remedy of a temporary stay should be granted, even though a request for the same stay had already been denied by Chief Justice Burger. 454 U.S. at 1308–09, 102 S.Ct. at 287. Justice Rehnquist stated that the position of Ms. Logan (who was awaiting release after having been arrested for driving while intoxicated) was no different, for constitutional purposes, from that of the pretrial detainees in *Bell v. Wolfish.* 454 U.S. at 1309, 102 S.Ct. at 287–88.[3] More importantly, he also stated that the result in *Bell v. Wolfish* was *not* predicated on a showing that searches were limited to those individuals whose alleged offenses were commonly associated by their very nature with the possession of weapons or contraband. 454 U.S. at 1310, 102 S.Ct. at 288.[4]

This view is also supported to some extent by the Second Circuit's holding in *Security and Law Enforcement Employees, District Council 82 v. Carey*, 737 F.2d 187 (2d Cir.1984). In upholding strip-searches of corrections officers in that case, the Second Circuit held that the individualized "reasonable suspicion" standard applied by the other circuits to strip/body cavity searches of inmates should govern strip searches of corrections officers working in correctional facilities. *Id.* at 204. The Second Circuit analogized the Fourth Amendment rights of correction officers to those of visitors to penal institutions, as recognized in *Hunter v. Auger*, 672 F.2d 668 (8th Cir.1982). *See also, Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985); *Smothers v. Gibson,* 778 F.2d 470 (8th Cir.1985). The Second Circuit noted that corrections officers as unincarcerated persons should possess higher expectations of privacy than incarcerated individuals, 737 F.2d at 201; *see also, Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3198–3202, 82 L.Ed.2d 393 (1984), and *Blackburn v. Snow, supra,* 771 F.2d at 563, implying that incarcerated individuals are not entitled to the protection of a "reasonable suspicion" standard (at least individually, rather than as a group).[5]

**3.** The opinion of the Fourth Circuit indicates that, unlike Mrs. Weber, Ms. Logan had already been ordered released on her own recognizance by a Magistrate, and was only prevented from leaving the police station by a policy of holding D.W.I. arrestees for four hours to ensure their sobriety. She was not being kept in a jail cell near other inmates; she was strip-searched only when she went into the jail to use the only available telephone to have someone pick her up. Although other courts consider it irrelevant whether an arrestee was housed with prison inmates, *see Giles v. Ackerman, supra,* 746 F.2d at 618–19; *Hill v. Bogans, supra,* 735 F.2d at 394; *Smith v. Montgomery County,* 547 F.Supp. 592, 598–99 (D.Md.1982), I do not. If an arrestee need not come in contact with jail inmates, it undermines the "prison security" justification for any strip searches of that arrestee. Sheriff Meloni has implicitly recognized this. Arrestees awaiting immediate release on bail are ordinarily placed in a holding cell away from jail inmates, and are only pat-down searched before being placed in that holding cell because they will not come in contact with jail inmates.

**4.** Justice Rehnquist's temporary stay was vacated two days later, 454 U.S. 1117, 102 S.Ct. 961, 71 L.Ed.2d 105 (1981), and certiorari was ultimately denied, 454 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). The denial of certiorari has no binding precedential effect, *United States ex rel. Goldsby v. Harpole,* 263 F.2d 71 (5th Cir. 1959), *cert. denied,* 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959), and certainly the opinion of only one Supreme Court Justice on an application for stay is not binding precedent. I cite his opinion only to emphasize his interpretation of his *Bell v. Wolfish* decision.

**5.** The Second Circuit did differentiate between mere strip searches and visual body cavity searches, holding that corrections officers could not be forced to undergo the latter in the absence of probable cause. The Second Circuit based this distinction in part upon the greater intrusiveness of visual body cavity searches, and in part on the testimony of prison administrators that contraband had *never* been discovered in the anal or genital areas of corrections officers. 737 F.2d at 207–08. By contrast, prison

Mrs. Weber argues that she should not be treated like the pre-trial detainees in *Bell* and *Block* because she was an arrestee who had not even been arraigned. She argues that arrestees such as she do not ordinarily plan their daily lives with the expectation of being arrested, and thus are far less likely to have concealed contraband in a bodily cavity than are those already detained persons who have just been able to visit with someone from outside the walls. *See Giles v. Ackerman, supra,* 746 F.2d at 617. She argues that a woman such as she, clad in an evening dress from her daughter's wedding and arrested on unjustified charges of resisting arrest, can never be reasonably expected to have concealed contraband in a bodily cavity. *See Dufrin v. Spreen, supra,* 712 F.2d at 1088.

The fact remains, however, that experience shows that there *are* arrestees who conceal contraband in body cavities and once inside the jail, these inmates pose a threat to security. A blanket strip/body cavity search program is an unquestionably effective way of stemming this flow of contraband. Despite my belief that less intrusive measures could be equally effective, I am precluded from substituting my judgment for that of Sheriff Meloni. *Bell v. Wolfish, supra,* 441 U.S. at 559, n. 40, 99 S.Ct. at 1884–85, n. 40; *Block v. Rutherford, supra.*

I note once again that all arrestees are not ordinarily searched in this manner. It appears from the record that arrestees for whom release on bail is imminent are ordinarily returned to the holding cell, after having been only pat-down searched before their initial admission to the holding cell. (Meloni Deposition at 24–25; Craven Deposition at 16–18.) Only if an arrestee cannot make bail immediately and cannot be returned to the holding cell for some reason (such as overcrowding) is she placed in a cell near the already-arraigned inmates and thus strip-searched in the interest of jail security. If this were not the case, I cannot say that my holding would be the same.

### CONCLUSION

This holding should not be construed to give free license to implement a strip search/cavity search policy with no concerns for the Fourth Amendment rights of arrestees. Indeed, jail administrators should always be sensitive to the highly intrusive and demeaning nature of the strip search/body cavity search, and should keep in mind that nothing in the established law prohibits the exercise of discretion and restraint. Because of the deference given to prison administrators in this area, they have a greater obligation to be particularly sensitive to exercising discretion and restraint. Even in the context of preventing the introduction of contraband into the general prison population, the jail personnel in applying the rule should be made to be especially aware of the tremendous potential for arbitrary or invidious infliction of unnecessary intrusions into a person's privacy and the ultimate effect it can have on his or her dignity.[6]

Accordingly, summary judgment is granted to defendants County of Monroe and Monroe County Sheriff Andrew P. Meloni, dismissing the complaint against them, and plaintiffs' cross-motion for partial summary judgment is denied.

ALL OF THE ABOVE IS SO ORDERED.

officials in this case have stated that arrestees do smuggle contraband in body cavities, and for that reason the Supreme Court has upheld visual body cavity searches of inmates, in *Bell v. Wolfish.*

The Second Circuit also applied the "reasonable suspicion" standard to strip searches conducted at this country's borders. *United States v. Ogberaha,* 771 F.2d 655 (2d Cir.1985).

**6.** I share the conclusions expressed in *Security and Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187 (2d Cir.1984), that the visual body cavity search represents one of the most grievous offenses against personal dignity and common decency, and is "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission...." *Id.* at 207, quoting *Tinetti v. Wittke,* 479 F.Supp. 486, 491 (E.D.Wisc.1979), *affd.,* 620 F.2d 160 (7th Cir.1980).