Rhonda BRENT, Plaintiff-Appellee-Cross-Appellant,

v.

Odesta ASHLEY, Carl Pietri, et al., Defendants-Appellants-Cross-Appellees.

No. 99-12169.

United States Court of Appeals,

Eleventh Circuit.

April 19, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 94-00646-CV-WDF), Wilkie D. Ferguson, Jr., Judge.

Before BARKETT and WILSON, Circuit Judges, and GEORGE[*], District Judge.

BARKETT, Circuit Judge:

In this interlocutory appeal, Prospero Ellis and Seymour Schor, both United States Customs Service inspectors, appeal the denial of their motion for summary judgment based on qualified immunity in an action filed by Rhonda Brent alleging violation of her Fourth Amendment rights during a strip search and x-ray examination. Brent cross-appeals the district court's grant of summary judgment on the basis of qualified immunity to Ellis and Schor's subordinates, Odesta Ashley, Carl Pietri, Francine Williams, Ricky Grim, Kathryn Dellane, and Lee Sanchez-Blair. We affirm.

FACTS

In reviewing summary judgment, we are bound to consider all of the evidence and the inferences drawn in the light most favorable to the non-moving party.[1] *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). On July 20, 1991, Rhonda Brent, a United States citizen, was returning home to Houston, Texas, aboard Alitalia Flight 618 from a vacation in Nigeria. During the Rome to Miami leg of her return flight,

[*]Honorable Lloyd D. George, U.S. District Judge for the District of Nevada, sitting by designation.

[1]We note that the defendants contest the factual predicate of Brent's case in numerous ways. For example, in their affidavits filed six years after the incident and attached to their motion for summary judgment, Schor and Ellis state that they based their decision to perform the strip search and x-ray examination of Brent on the following facts and observations: (1) Brent and Kehinde Elbute, a passenger on Brent's flight, fit a smuggling profile of African-American women on the same flight as Nigerian men; (2) Brent arrived from a known source country; (3) she showed disapproval of the treatment Elbute was receiving from law enforcement officials; (4) her ticket had been purchased by a friend with a credit card from the same travel agency where Elbute's was purchased; (5) she, like Elbute, was going to Houston; (6) she wore inexpensive clothes; and (7) she was nervous and became agitated when confronted. Further, the defendants also claim that Brent consented to the searches. However, because we are reviewing a summary judgment, we must resolve all factual disputes in favor of Brent. *See, e.g., Hudson v. Hall,* 231 F.3d 1289, 1297 (11th Cir.2000); *Jackson v. Sauls,* 206 F.3d 1156, 1166 (11th Cir.2000).

Brent met Kehinde Elbute, a black Nigerian man who was also en route to Houston. Brent and Elbute were the only black persons on the flight. The flight arrived at Miami International Airport and the passengers disembarked from the plane. As Brent entered the baggage claim area at the airport, she noticed Customs Agent Ricky Grim and his inspection dog with Elbute. Brent stopped briefly, observed Grim searching Elbute and his luggage, and shook her head in disapproval. Based on this look and gesture, Inspector Seymour Schor instructed Inspector Carl Pietri to detain Brent and escort her to the examination area where Elbute had been taken. Pietri seized Brent's passport and other documents, isolated her from other passengers and took her to the examination area for interrogation. Brent protested Pietri's actions, alleging that she was being singled out because she was black.

Schor questioned both Brent and Elbute about the nature of their trips and personally conducted a thorough search of both of their luggage, in which he took every item out of their bags and examined each item separately and carefully. He found no narcotics, nor did he find any items commonly associated with drug couriers. Brent continued to protest the search stating that she was aware of her rights and that she was being treated this way because she was black. Despite finding no objective evidence that she was a drug courier, Schor continued to detain Brent for further questioning.

Shortly thereafter, Schor was joined by Supervisor Inspector Prospero Ellis. Ellis re-examined Brent's travel documents, clothing and luggage, and questioned her. Both Ellis and Schor then decided to conduct a full body pat-down and strip search. The report form filed by the agents at the time of the search indicated that the reasons for conducting the search were Brent's nervousness and her arrival from a source country.[2] Female customs agents Odesta Ashley, Lee Sanchez-Blair and Kathryn Dellane were called in to assist.

The body pat-down and strip search, conducted by Blair and witnessed by Ashley and Dellane, consisted of touching Brent's crotch area, ordering her to pull down her clothes, removing and examining her sanitary napkin, squeezing her abdomen from the pubis to thorax, and monitoring her responsive reactions. The search revealed none of the typical indicators of internal drug smuggling. There was no rigid or

---

[2]Another form filed after the search indicated that the reasons for conducting the search were Brent's nervousness, her arrival from a source country, and the incorrect observation that her ticket was purchased for cash. Because this form conflicts with other forms filed after the strip search, and because it is undisputed that Brent's ticket was purchased with a credit card, we must disregard this additional factor when looking at the evidence in the light most favorable to Brent. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

distended abdomen, no girdle to hold up the abdomen, no synthetic lubricants, and no contraband could be seen in her body cavities. After the strip search, Brent asked if she could use the bathroom. She was allowed to use the bathroom, but was watched closely by the female agents and told not to flush the toilet. After she had gone to the bathroom, the agents examined Brent's urine for signs of contraband. None were found. At some point during her detention, Brent's name was entered into the Treasury Enforcement Computer Systems to search for frequent travels or past arrests. The inquiry returned nothing suspicious.

Although the pat-down, strip search, and electronic record search revealed nothing, Ellis and Schor nonetheless decided that an x-ray and pelvic examination at the hospital should be performed. The search report form filed the day after the x-ray listed the reasons for conducting the examination as Brent's nervousness and her arrival from a source country. Dellane handcuffed Brent and transported her to Jackson Memorial Hospital. Prior to transport, Brent was presented with a consent form and told that if she refused to sign it she could be held for 35 days or indefinitely until a judge ordered the x-ray. She requested to speak with an attorney and to call home. Both requests were denied. She signed the consent form and waived her *Miranda* rights after being told she had no choice. Upon arrival at the prison ward of the hospital, Brent was told to sign another consent form. Inspector Francine Williams escorted Brent to the x-ray room and remained with Brent throughout the examination. The examination revealed a complete absence of drugs. Dellane drove Brent back to the airport and, ten hours after she was first detained, made arrangements for Brent to return home to Houston. Brent filed this suit against the United States under the Federal Tort Claims Act ("FTCA") and against nine named customs employees, alleging the commission of common law torts and constitutional violations pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The district court dismissed with prejudice Brent's FTCA claim for failure to file the action within the statutory time limits. The individual defendants then moved for summary judgment on Brent's *Bivens* claims based on qualified immunity. The district court granted the motion with regard to Ashley, Pietri, Williams, Grim, Sanchez, Dellane, and Sanchez-Blair, and denied the motion as to Ellis and Schor. This appeal followed.[3]

---

[3]The district court's rejection of a qualified immunity defense is a "final decision under the collateral order doctrine over which this court has jurisdiction pursuant to 28 U.S.C. § 1291." *Harris v. Board of Educ. of the City of Atlanta,* 105 F.3d 591, 594 (11th Cir.1997). Further, the district court certified its grant of summary judgment based on qualified immunity to Ashley, Pietri, Williams, Grim, Dellane, and Sanchez-Blair, pursuant to Fed.R.Civ.P. 54(b). Thus, we have jurisdiction to hear this interlocutory appeal.

We review *de novo* a district court's ruling on summary judgment, applying the same legal standards as the district court. *See Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir.1999). Summary judgment is appropriate only when the evidence before the court demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

DISCUSSION

"A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotations omitted); *see also McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir.1999) ("In reviewing the district court's [denial] of summary judgment, we must 'first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.' ") (quoting *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)).[4] Thus, we address initially the question of whether Ellis and Schor's actions violated Brent's constitutional rights.

1.    *Was there a violation of Brent's Fourth Amendment rights?*

Rather than viewing the initial stop, strip search and x-ray examination of Brent as a single incident, the facts of this case compel that each progressive stage of the search be viewed as a discrete occurrence. Accordingly, in determining whether Brent has met her burden to demonstrate the existence of a constitutional violation, we examine the constitutionality of the initial stop, the strip search and the x-ray examination separately.

a.    *Was the initial stop constitutional under the Fourth Amendment?*

During the initial stop of Brent, the customs agents isolated Brent from the other passengers, asked her questions about the nature of her trip, and searched her luggage. The decision to stop and search Brent was based upon the fact that she shook her head in disapproval upon seeing the way customs agents were treating a co-passenger. Brent argues that a simple expression of disapproval cannot provide reasonable suspicion sufficient to justify the stop and search and thus the initial stop is constitutionally infirm.

We agree with Brent that her simple disapproving head movement is insufficient to raise reasonable

---

[4]As the Supreme Court explained in *Wilson,* "[d]eciding the constitutional question before addressing the qualified immunity question ... promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." 526 U.S. at 609, 119 S.Ct. 1692.

suspicion; however, the law is clear that "[r]outine [border] searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant ..." *United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *see United States v. Vega-Barvo,* 729 F.2d 1341, 1345 (11th Cir.1984). Because the initial stop did not constitute more than a routine border search, Brent has failed to demonstrate that the initial stop violated her Fourth Amendment rights.

*b.      Was the strip search constitutional under the Fourth Amendment?*

The Supreme Court has held that "detention of a traveler at the border, beyond the scope of routine customs search and inspection, is justified at its inception if customs agents considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband ..." *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304. Reasonable suspicion is "more than an inchoate and unparticularized suspicion or hunch," *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotations omitted), and requires that officials have a " 'particularized and objective basis for suspecting the particular person' of ... smuggling." *Montoya de Hernandez,* 473 U.S. at 541-42, 105 S.Ct. 3304 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "In most of these cases, the suspect was initially approached because [s]he fit a drug courier profile. It is not the profile, however, but the factors which make up the profile which are crucial to whether or not there is a reasonable suspicion. If the profile is overly general, it carries little weight in this determination." *Vega-Barvo,* 729 F.2d at 1349. Accordingly,

> [r]easonable suspicion to justify a strip search can *only* be met by a showing of articulable facts which are particularized as to the place to be searched....

*Id.* (internal citations omitted) (emphasis added). Moreover, as a search progresses from a stop, to a pat-down search, to a strip search, an agent must reevaluate whether reasonable suspicion to justify the next level of intrusion exists in light of the information gained during the encounter. *See, e.g., Vega-Barvo,* 729 F.2d at 1349. Under these Supreme Court and Eleventh Circuit standards, the strip search of Brent, on the basis of the generalized and unparticularized reasons given in either the contemporaneously filed search report forms or in the affidavits filed six years later,[5] constitutes a Fourth Amendment violation.

---

[5]Although their later affidavits essentially assert the same basic reasons for the search, the affidavits frame these reasons slightly differently; to wit:  (1) Brent fit a smuggling profile;  (2) Brent arrived from a known source country;  (3) she showed disapproval of the treatment Elbute was receiving;  (4) her ticket had been purchased by a friend with a credit card from the same travel agency where Elbute's was

This Court has previously applied these standards[6] in an analogous setting and found that a strip search violated the Fourth Amendment. *United States v. Afanador,* 567 F.2d 1325 (5th Cir.1978).[7]  In *Afanador,* customs officials, acting on an informer's tip, stopped two airline attendants arriving from Columbia, a known source country, searched their luggage and, despite finding no contraband, proceeded to strip search them. *Id.* at 1327.  The informer's tip included the name of one of the airline attendants, but was silent as to whether any other attendants were involved.  The government argued that the informer's tip provided reasonable suspicion to justify the strip search of the attendant named in the tip, and the fact that the attendant not named in the tip fit a smuggling profile provided reasonable suspicion to strip search her. The court rejected this argument stating that " 'a generalized suspicion of criminal activity such as that which is fostered, for example, when one closely resembles a "smuggling profile" will not normally in itself permit a reasonable conclusion that a strip search should occur.' " *Id.* The court further stated that while a smuggling profile "may have its utility, ... we cannot countenance its use to perform plastic surgery disfiguring the Fourth Amendment." *Id.* at 1330 n. 6. The Former Fifth Circuit then held that although the tip provided reasonable suspicion to strip search the named attendant, "the fruitless search of [the unnamed attendant's] luggage and failure to elicit suspicious information on questioning, would, in these circumstances preclude justification for a strip search." *Id.* at 1330.

Here, similar to *Afanador,* Ellis and Schor based their decision to strip search Brent upon the fact that Brent fit a general profile of arrival from a source country, and she was nervous.  However, in making this determination, they, like the agents in *Afanador,* disregarded the fact that:  (1) a non-intrusive search of Brent's person and her luggage revealed nothing to support the suspicion that she was smuggling narcotics; (2) Brent presented verifiable residence and employment information;  and (3) a check of Brent's name in the

---

purchased;  (5) she, like Elbute, was going to Houston;  (6) she wore inexpensive clothes;  and (7) she was nervous and became agitated when confronted.

[6]Although *Afanador* preceded *Montoya de Hernandez* by six years, *Afanador*'s holding is not affected by the Supreme Court case.  In *Montoya de Hernandez,* the Supreme Court resolved a circuit split regarding the degree of suspicion—reasonable suspicion, probable cause, or something in between—necessary to justify an invasive border search.  The Supreme Court, agreeing with the reasoning in *Afanador,* held that a invasive border search requires a showing of reasonable suspicion. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304.

[7]In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Treasury Enforcement Computer System revealed nothing suspicious. Under *Afanador,* upon these facts, the strip search of Brent was unconstitutional.

More recent cases further compel this conclusion. In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), a DEA agent stopped a traveler in the Atlanta Airport because his characteristics and actions fit the "drug courier profile": (1) the defendant arrived from Fort Lauderdale, a city the agent knew to be a principal source of cocaine; (2) he arrived early in the morning, when law enforcement activity is diminished; (3) he and his companion appeared to be concealing the fact that the two were traveling together; and (4) he and his companion had no luggage except for their shoulder bags. *Id.* at 440-41, 100 S.Ct. 2752. The Supreme Court concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." *Id.* at 441, 100 S.Ct. 2752. The only fact that related to the individuals' conduct, the Court found, was that the defendant preceded his companion and occasionally looked backward at him. The Court found that the other circumstances, including arrival from a source location, describe a large number of "presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.; see also United States v. Grant,* 920 F.2d 376, 386 (6th Cir.1990) (holding that arrival from a source location does not provide reasonable suspicion because "[o]ur experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center").

In this case, the facts known to Ellis and Schor were far less suspicious than the ones found insufficient as a matter of law by the Supreme Court in *Reid.* Even in combination, the articulated characteristics here could be ascribed generally to a great number of innocent travelers. Indeed, the only fact that relates to Brent's conduct is that she was nervous. However, this general observation of Brent's nervousness, standing alone, cannot provide "reasonable suspicion" to justify the strip search.[8] *See United*

_____

[8]We note, as did the district court, that courts should be cautious in deferring to subjective determinations by even trained inspectors. In this case, Schor stated that he suspected Brent was a drug smuggler because she appeared nervous and agitated when questioned. In a previous case, however, Schor testified that he suspected an individual was a drug smuggler because the individual was "fairly deadpan," expressionless, without visible signs of agitation and did not protest being singled out for questioning. *See United States v. Rivera,* 926 F.2d 1564, 1568 (11th Cir.1991). If either a nervous or calm reaction to questioning can, by itself, support a finding of reasonable suspicion, an inspector could justify a search of anyone.

*States v. Tapia,* 912 F.2d 1367, 1371 (11th Cir.1990) (holding that no reasonable suspicion existed to support detention when suspect appeared visibly nervous during confrontation with officers, and had few pieces of luggage); *accord United States v. White,* 890 F.2d 1413, 1417 (8th Cir.1989) (finding insufficient evidence to support reasonable suspicion for stop where defendant bought airline ticket with cash, arrived on flight known to be used by narcotics traffickers, and acted nervous and suspicious in the airport); *Grant,* 920 F.2d at 386 ("[n]ervousness is entirely consistent with innocent behavior, especially at an airport where a traveler may be anticipating a long-awaited rendezvous with friends or family") (citing *United States v. Andrews,* 600 F.2d 563, 566 (6th Cir.1979)); *see also United States v. Barron-Cabrera,* 119 F.3d 1454, 1461 (10th Cir.1997) (holding that " '[w]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials ....' ") (quoting *United States v. Peters,* 10 F.3d 1517, 1521 (10th Cir.1993)); *United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997) ("nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on ... nervousness ... as a basis for reasonable suspicion ... 'must be treated with caution.' ") (quoting *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir.1994)); *United States v. Black,* 675 F.2d 129, 136-37 (7th Cir.1982) (holding that, although the totality of circumstances supported reasonable suspicion, it was not enough merely that the passenger had arrived from Fort Lauderdale, was the first off the plane, deplaned speedily and in a disoriented state, and appeared nervous). The initial stop and questioning of Brent, with the attendant search of her luggage, failed to produce particularized and objective evidence that would raise reasonable suspicion that she was a drug courier. Accordingly, we conclude that the strip search of Brent violated the Fourth Amendment.

c.          *Was the x-ray examination constitutional under the Fourth Amendment?*

In *United States v. Pino,* 729 F.2d 1357, 1359 (11th Cir.1984), we recognized that the "the amount of [reasonable] suspicion needed for an x-ray [is] ... the same amount needed for a strip search." (citing *Vega-Barvo,* 729 F.2d at 1345). The agents listed the same reasons for conducting the x-ray examination as they did for conducting the strip search. As discussed above, these types of general observations, without more, can never give rise to reasonable suspicion sufficient to justify an intrusive search such as an x-ray examination. Moreover, the unconstitutionality of the x-ray examination is more apparent than the strip search, because at the time of the x-ray, in addition to the significant exculpatory factors of which they had

knowledge prior to strip search, Ellis and Schor were also aware that Brent's urine had no traces of contraband and that the strip search revealed nothing to suggest that Brent was carrying drugs internally. Accordingly, we conclude that the x-ray examination of Brent also violated the Fourth Amendment.

2.      *Are Ellis and Schor entitled to qualified immunity?*

Having determined that the strip search and x-ray violated the Fourth Amendment, we turn to examine whether Ellis and Schor can be held personally liable for their actions.[9] Our cases hold that a law enforcement officer who conducts an unconstitutional search based upon a reasonable but mistaken conclusion that reasonable suspicion exists is entitled to qualified immunity. *Jackson,* 206 F.3d at 1165-66. Thus, "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer has 'arguable' reasonable suspicion." *Id.; see also Williamson v. Mills,* 65 F.3d 155, 157 (11th Cir.1995); *Swint v. The City of Wadley, Alabama,* 51 F.3d 988, 996 (11th Cir.1995); *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1558 (11th Cir.1993). In determining whether Ellis and Schor had "arguable reasonable suspicion" to justify the strip search and x-ray examination, we analyze whether "a reasonable officer could have believed that the search[es] comported with the Fourth Amendment." *Anderson,* 483 U.S. at 637, 107 S.Ct. 3034. This inquiry ensures that law enforcement officials " 'reasonably can anticipate when their conduct may give rise to liability.' " *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).[10] With these standards in mind, we now consider whether Ellis and Schor had "arguable reasonable suspicion" to support either the strip search or x-ray examination.

a.      *Was there "arguable reasonable suspicion" for the strip search?*

In 1978, well before the strip search of Brent, our precedent clearly established that even if Brent fit a drug courier profile, the "fruitless search of [her] luggage and the failure to elicit suspicious information [from her] on questioning would ... preclude ... justification for a strip search." *Afanador,* 567 F.2d at 1330.

---

[9]Because we have concluded that the initial stop and search did not violate the Fourth Amendment, there is no need to consider qualified immunity as to the initial stop.

[10]In *Lanier,* the Supreme Court reenforced the "fair warning" standard and held that "general statements of the law are not inherently incapable of giving fair and clear warning ... a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.' " 520 U.S. at 271, 117 S.Ct. 1219 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). *See also Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000) (holding that official not entitled to qualified immunity when "conduct lies so obviously at the very core of what the Fourth Amendment prohibits").

Moreover, at the time of the incident, Supreme Court precedent had made clear that a law enforcement official must have "reasonable suspicion" to justify any stop at the border beyond a routine non-intrusive search. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304. The Supreme Court had held that reasonable suspicion must be based upon "more than an inchoate and unparticularized suspicion or hunch," *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581(internal quotations omitted), but rather, requires "particularized and objective" facts. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304; *see also Vega-Barvo,* 729 F.2d at 1349; *Pino,* 729 F.2d at 1359.

Moreover, the Eleventh Circuit, as well as several other circuits, had clearly defined the degree of reasonable suspicion standard required to justify a strip search at a border, holding that "reasonable suspicion to justify a strip search can *only* be met by a showing of articulable facts which are particularized as to the place to be searched." *Vega-Barvo,* 729 F.2d at 1349 (emphasis added); *see also United States v. Yakubu,* 936 F.2d 936 (7th Cir.1991); *United States v. Oyekan,* 786 F.2d 832 (8th Cir.1986); *United States v. Ogberaha,* 771 F.2d 655 (2d Cir.1985). This standard unambiguously established that the facts an officer relies upon in justifying a strip search must be (1) particularized to the place to be searched, and (2) sufficient to raise reasonable suspicion. *Vega-Barvo,* 729 F.2d at 1349. Here, the two factors Ellis and Schor relied upon in justifying the search—Brent's arrival from a source location and her nervousness—were not particularized to the place to be searched and had been expressly rejected by the Supreme Court and the Eleventh Circuit as factors that, standing alone, give rise to reasonable suspicion.

Indeed, arrival from a source location and nervousness are paradigmatic examples of the non-particularized, overly general profile which this Court made clear can never support a finding of reasonable suspicion to justify a strip search. *See Vega-Barvo,* 729 F.2d at 1349. Moreover, at the time of the search, Supreme Court and circuit precedent expressly rejected the proposition that a general courier profile, without more, provides reasonable suspicion. *See Reid,* 448 U.S. at 441, 100 S.Ct. 2752; *Afanador,* 567 F.2d at 1330; *see also, Tapia,* 912 F.2d at 1371; *Grant,* 920 F.2d at 386; *White,* 890 F.2d at 1417; *Black,* 675 F.2d at 136-37. In *Reid,* the Supreme Court considered and rejected the argument that arrival from a source location could ever, by itself, provide reasonable suspicion. 448 U.S. at 441, 100 S.Ct. 2752. Similarly, in *Tapia,* the Eleventh Circuit considered and rejected the argument that being nervous when confronted by a law enforcement official provides reasonable suspicion. 912 F.2d at 1371 ("being a Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a [law enforcement

official], or traveling on the interstate with [out of state] licence plates do not provide a minimal, particularized basis for a conclusion of reasonable suspicion"); *see also White,* 890 F.2d at 1417; *Grant,* 920 F.2d at 386; *Barron-Cabrera,* 119 F.3d at 1461; *Wood,* 106 F.3d at 948; *Black,* 675 F.2d at 136-37.

Accordingly, the facts upon which Ellis and Schor based their decision to search Brent are not only unparticualrized, but also were explicitly rejected as grounds for reasonable suspicion by the Supreme Court and the Eleventh Circuit. *Reid,* 448 U.S. at 441, 100 S.Ct. 2752; *Tapia,* 912 F.2d at 1371. Moreover, as noted earlier, our precedent had established that even if Brent fit a courier profile, the "fruitless search of [her] luggage and the failure to elicit suspicious information [from her] on questioning would ... preclude ... justification for a strip search." *Afanador,* 567 F.2d at 1330. Based upon the foregoing, we conclude that a reasonable customs agent at the time of the incident would have known that a strip search under the facts of this case was a violation of Brent's Fourth Amendment rights. Thus, Ellis and Schor did not have "arguable reasonable suspicion" to support the strip search and are not entitled to qualified immunity from liability arising from their alleged unconstitutional conduct.

b.      *Was there "arguable reasonable suspicion" for the x-ray examination?*

As noted above, by the time of the incident the Eleventh Circuit had established that "the amount of [reasonable] suspicion needed for an x-ray [is] ... the same amount needed for a strip search." *Pino,* 729 F.2d at 1359. Here, as with the strip search, the only undisputed reasons for the x-ray examination are Brent's nervousness and her arrival from a source location. For the reasons stated above, these factors not only fail to raise reasonable suspicion to justify the x-ray examination, but also fail to raise even "arguable reasonable suspicion." Based on the foregoing, we conclude that because a reasonable customs agent would have understood that the x-ray examination, based only upon an observation of nervousness and a general profile, violated Brent's constitutional rights, there was not "arguable reasonable suspicion" to support the x-ray examination, and therefore Ellis and Schor are not protected by qualified immunity from civil liability arising from the x-ray examination.[11]

3.      *Are Ellis and Schor's subordinates protected by qualified immunity?*

The district court determined that only Schor and Ellis made decisions to conduct the intrusive

---

[11]Ellis and Schor also argue that summary judgment is appropriate in this case for a reason not raised in the district court. Because the issue was not raised in the district court, we decline to review it here. *See Narey v. Dean,* 32 F.3d 1521, 1526 (11th Cir.1994) (stating that " 'appellate courts generally will not consider an issue or theory that was not raised in the district court.' ") (quoting *FDIC v. Verex Assurance, Inc.,* 3 F.3d 391, 395 (11th Cir.1993)).

searches of Brent, and that Ashley, Pietri, Williams, Grim, Dellane, and Sanchez-Blair had no discretionary authority and no reason to suspect that Brent's constitutional rights were being violated. Accordingly, the district court concluded that Ashley, Pietri, Williams, Grim, Dellane, and Sanchez-Blair acted reasonably in following Ellis and Schor's orders and that qualified immunity shielded them from civil liability.

On appeal, Brent argues that whether a government agent is acting in a supervisory role is not determinative of *Bivens* liability and that following orders does not immunize government agents from civil rights liability. While we agree with Brent's general summary of the law, we do not agree that the district court erred in granting summary judgment in favor of Ashley, Pietri, Williams, Grim, Dellane, and Sanchez-Blair.

In *Hartsfield v. Lemacks,* 50 F.3d 950 (11th Cir.1995), we held that, although a deputy sheriff who failed to make a reasonable effort to identify the proper residence to be searched was not entitled to qualified immunity on a civil rights claim, see *id.* at 955, the officers who accompanied the deputy on the search were protected by qualified immunity because "nothing in the record indicate[d] that these officers acted unreasonably in following [the deputy's] lead, or that they knew or should have known that their conduct might result in a violation of the [plaintiff's] rights." *Id.* at 956. Here, the record is devoid of any evidence that would support the conclusion that Ashley, Pietri, Williams, Grim, Dellane, and Sanchez-Blair acted unreasonably.

The record reflects that Grim merely inspected Elbute and had no contact with Brent. Pietri, under orders of Schor, asked Brent a few routine questions, obtained her documents and walked her to the secondary examination area. Dellane, on orders of Schor and Ellis, witnessed the strip search, traveled with Brent to the hospital, and returned with her to the airport. Ashley, on orders of Schor and Ellis, witnessed the strip search. Williams, on orders of Schor and Ellis, took Brent to the x-ray room, and arranged her return to the airport. Sanchez-Blair, at the direction of Schor and Ellis, conducted the strip search. Each of these individuals acted at the order of a superior and the record reflects no reason why any of them should question the validity of that order. We, therefore, affirm the district court's grant of qualified immunity to Ashley, Pietri, Williams, Grim, Dellane, and Sanchez-Blair.

For all of the above reasons, the rulings of the district court are

AFFIRMED.