UNITED STATES of America, Appellee,

v.

Georgette BRAKS, Defendant,
Appellant.

No. 87–1363.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1987.

Decided March 11, 1988.

Stephen Hrones, by appointment of the
Court, with whom Hrones & Harwood, Bos-
ton, Mass., was on brief for defendant,
appellant.

William H. Kettlewell, Asst. U.S. Atty.,
with whom Frank L. McNamara, Jr., Act-
ing U.S. Atty., Boston, Mass., was on brief
for appellee.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge.

Georgette Braks attempted to enter the United States with heroin concealed on her person. Customs inspectors became suspicious and undertook a search of Braks' person, during which the heroin was discovered. After her subsequent arrest and indictment, Braks filed a motion to suppress the heroin that had been seized by Customs. That motion was denied by the District Court. Braks then pleaded guilty but preserved for appeal to this court the ruling on her motion to suppress. We hold that the District Court properly denied the motion to suppress, and affirm the conviction.

### The Exposition

Braks is a Lebanese citizen who sought to enter the United States through Boston's Logan Airport on October 2, 1986. She was arriving from Beirut, a city known to the Customs Service as a source for narcotics. The Customs inspectors on duty at Logan had been alerted in advance to be on the lookout for Braks. Upon arrival Braks presented her Customs declaration to Inspector Robert Burke, and simultaneously informed him that she did not speak English.[1] Upon ascertaining that Braks did speak French, Burke summoned Inspector Mary Lou Gilman, who had greater proficiency with that language than did Burke.[2]

Burke remained present while Gilman conducted a routine interrogation of Braks. Gilman learned that (i) Braks intended to stay in the United States for ten days; (ii) the purpose of Braks' visit was to obtain medical treatment in Boston; (iii) Braks had not arranged in advance to consult

with any particular doctor in Boston or elsewhere; (iv) after her business in Boston, Braks would be proceeding to New York City to visit her brother; and (v) Braks had not given her brother advance notice of her arrival, but instead intended to surprise him.

Gilman then asked Braks to open her luggage. Burke proceeded to examine the contents, but Gilman remained present and continued to observe Braks during the five minutes or so that that examination took. Gilman noticed that Braks was wearing a loose-fitting, tent-type dress that Gilman knew was suitable for concealing contraband. Gilman also noticed that Braks appeared bulky about the midsection significantly out of proportion to Braks' thin face, hands, wrists and arms. To Gilman, this anomaly indicated that Braks was concealing some item underneath her dress.

Meanwhile, Burke had completed his inspection of the contents of Braks' two suitcases and two carry-on bags. Burke later testified that that amount of luggage had at the outset struck him as "excessive" for a ten-day stay. The amount of *clothing* that that luggage proved actually to contain, however, seemed to him sufficient for only a two- or three-day stay.

Braks' several inconsistent and anamolous assertions, when coupled with the observations Gilman and Burke had made, led the two Customs inspectors to conclude that a secondary search was appropriate. Gilman so informed Braks and explained to her that she would be physically searched and that the search would include searching under her dress.

A second female Customs inspector was summoned, and she and Gilman escorted Braks into a private room. Gilman said, in French, "I want to find out if you are carrying anything under your clothing,"

---

* Of the Fifth Circuit, sitting by designation.

1. Lest there appear to be a logical impossibility inherent in this assertion: apparently in preparation for her passage through U.S. Customs, Braks had memorized the one sentence "Speak no English," which was the first thing she said to Burke.

2. At the hearing on the motion to suppress, Gilman described her own abilities with the French language in the following words: "My grammar is not very good. My pronunciation is fairly good. I can understand usually most of what someone is saying to me and they seem to understand what I'm saying to them."

while simultaneously making an upward-sweeping gesture with her hands. The District Court credited Gilman's later testimony to the effect that she did not intend that Braks raise her skirt at that time. Gilman testified that she planned instead to conduct a "pat-down" search of Braks' person, and was just about to do so when Braks raised her own skirt. But this response—perhaps even a voluntary reflex—was not the end of it. For the trial court concluded that Braks reasonably interpreted the words and the gesture together as an instruction to raise her dress. Whether it was voluntary or involuntary, whether reflex or response to authoritative instruction, Braks had lifted her skirt. Gilman observed an abnormal bulge in Braks' girdle.

Gilman then left to attempt to secure a more capable French interpreter, but returned a few minutes later without finding one. At that time, Braks in essence admitted that she was carrying contraband.[3] Inspector Gilman asked to see the contraband and Braks removed two packages from her girdle that were found to contain a total of approximately one kilogram of heroin.

Braks was then arrested, read her Miranda rights, and charged with importation of heroin into the United States.[4] After indictment, Braks filed a motion to suppress the heroin that had been seized which, following a hearing, was denied. Braks then entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2), which was accepted by the court. Braks was sentenced to three years' incarceration. Braks now appeals the District Court's ruling on the motion to suppress.

### Routine or Not Routine?—That's the Question

■ It is routine law that courts routinely hold that Customs officials may conduct "routine searches of the persons and effects of entrants ... [at international borders without being] subject to any requirement of reasonable suspicion, probable cause, or warrant."[5] The degree of invasiveness or intrusiveness associated with any particular type of search determines whether or not that search qualifies as routine.[6] The Supreme Court and several Courts of Appeals have highlighted the fol-

---

3. More specifically, Braks volunteered that she had been approached in Beirut Airport by a male stranger, who had given her the items later concealed in her girdle. He induced her to carry the items with her to the United States upon the promise that she would receive "a lot of money" at some unspecified time in the future—presumably after she delivered the items to the courier he told her would meet her plane at Logan Airport. Braks testified later that she was aware that the packages contained drugs, but did not know what specific drug or drugs they held.

4. Under 21 U.S.C. sections 952, 960, and 963.

5. *United States v. Montoya De Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381, 389 (1985).

   In footnote 1 of its opinion, the Supreme Court cited as support for the proposition here quoted *United States v. Ramsey*, 431 U.S. 606, 616–619, 97 S.Ct. 1972, 1978–1980, 52 L.Ed.2d 617, 626–628 (1977); *Almeida–Sanchez v. United States*, 413 U.S. 266, 272–273, 93 S.Ct. 2535, 2539–2540, 37 L.Ed.2d 596, 602 (1973); and the dissent in that same case, 413 U.S. at 288, 93 S.Ct. at 2547, 37 L.Ed.2d at 611 (1973).

   *Ramsey* involved the importation of heroin into the United States through the mails. *Al-*

*meida–Sanchez* involved the search of an automobile first observed by a roving Customs patrol when the auto was already inside the U.S., and held that the search there at issue was not a border search and therefore was subject to the requirements of the Fourth Amendment, which had not been satisfied. Since neither case involved a search of individuals' *persons* at international borders, however, the Supreme Court apparently believed that the accuracy of the observation it made in *Montoya De Hernandez* as to routine searches and seizures is not directly affected by whether the precise object of the routine search in question is an individual's person, or instead is his luggage and effects, his automobile, etc. The nature of the precise object of the search may have an indirect effect, however, in that it may affect the threshold level of invasiveness at which a search is categorized as non-routine rather than routine. See n. 6, *infra*.

6. *See United States v. Vega–Barvo*, 729 F.2d 1341, 1344 (11th Cir.1984), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984), and the cases cited there. Invasiveness is a function of the degree of indignity that accompanies a particular search method rather than of the extensiveness or thoroughness of the search per se. *Id.* at 1345.

lowing factors for determining the degree of invasiveness that accompanies any particular search:

(i) whether the search results in the exposure of intimate body parts or requires the suspect to disrobe; [7]

(ii) whether physical contact between Customs officials and the suspect occurs during the search; [8]

(iii) whether force is used to effect the search; [9]

(iv) whether the type of search exposes the suspect to pain or danger; [10]

(v) the overall manner in which the search is conducted; [11] and

(vi) whether the suspect's reasonable expectations of privacy, if any, are abrogated by the search; [12]

■ In light of these several factors the only types of border search of an individual's person that have been consistently held to be non-routine are strip-searches and

---

**7.** *United States v. Klein,* 522 F.2d 296, 300 (1st Cir.1975) (not a border search); *United States v. McMurray,* 747 F.2d 1417, 1420 (11th Cir.1984); *United States v. Vega–Barvo,* 729 F.2d 1341, 1347 (11th Cir.1984), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984); *United States v. Rice,* 635 F.2d 409, 410 (5th Cir. Unit B 1981).

**8.** *Blackburn v. Snow,* 771 F.2d 556, 565 n. 5 (1st Cir.1985) (prisoner search); *United States v. Klein,* 522 F.2d 296, 300 (1st Cir.1975) (not a border search); *United States v. Oyekan,* 786 F.2d 832, 838 (8th Cir.1986); *United States v. Ogberaha,* 771 F.2d 655, 659 (2d Cir.1985); *United States v. McMurray,* 747 F.2d 1417, 1420 (11th Cir.1984); *United States v. Vega–Barvo,* 729 F.2d 1341, 1346 (11th Cir.1984), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984); *Dufrin v. Spreen,* 712 F.2d 1084, 1087 (6th Cir.1983) (search was "visual only") (not a border search); *United States v. Rice,* 635 F.2d 409 (5th Cir.1981).

**9.** *United States v. Chadwick,* 532 F.2d 773, 783 (1st Cir.1976) (breaking into locked suitcases) (not a border search) *aff'd* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Oyekan,* 786 F.2d 832, 838 (8th Cir.1986); *United States v. Ogberaha,* 771 F.2d 655, 659 (2d Cir. 1985); *United States v. McMurray,* 747 F.2d 1417, 1420 (11th Cir.1984); *United States v. Vega–Barvo,* 729 F.2d 1341, 1347 (11th Cir. 1984), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984); *United States v. Sanders,* 663 F.2d 1, 3 (2d Cir.1981); *United States v. Summerfield,* 421 F.2d 684, 685 (9th Cir.1970) ("physical restraint ... was that necessary to perform a satisfactory examination"); *Townsend v. United States,* 271 F.2d 445, 446 (4th Cir.1959) (search pursuant to arrest); *Blackford v. United States,* 247 F.2d 745, 752 (9th Cir. 1957), *cert. denied,* 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958).

**10.** *Winston v. Lee,* 470 U.S. 753, 761, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662, 669 (1985); *United States v. Sandler,* 644 F.2d 1163, 1167 (5th Cir. 1981).

**11.** *United States v. Klein,* 522 F.2d 296, 300 (1st Cir.1975) (not a border search); *United States v. Ogberaha,* 771 F.2d 655, 659 (2d Cir.1985); *Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir.1984) (not

a border search); *Dufrin v. Spreen,* 712 F.2d 1084, 1087 (6th Cir.1983) (not a border search) (search was "conducted by a female attendant, ... occurred but once, ... was conducted in the privacy of a room in which only the jail matron could observe the prisoner, [and] [t]here [was] no claim of offensive behavior on the part of the matron or of anyone else in connection with the search, beyond that inherent in the nature of the inspection itself"); *United States v. Schleis,* 543 F.2d 59, 61 (8th Cir.1976), *vacated* 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977) (not a border search) (manner of search for weapons not "unduly intrusive"); *United States v. Brown,* 499 F.2d 829, 834 (7th Cir. 1974), *cert. denied,* 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974); *United States v. Forbicetta,* 484 F.2d 645, 646 (5th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974), ("dignified manner"); *United States v. Summerfield,* 421 F.2d 684, 685 (9th Cir.1970) ("The [rectal] examination was conducted in the same office where the doctor, a licensed physician, examined his regular patients.")

**12.** *Winston v. Lee,* 470 U.S. 753, 761, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662, 669 (1985); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *United States v. Miller,* 589 F.2d 1117, 1124 (1st Cir.1978), *cert. denied* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (not a border search); *United States v. Mehra,* 824 F.2d 297, 298 (4th Cir.1987) (not a border search); *United States v. Fortna,* 796 F.2d 724, 738 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *United States v. Mosquera–Ramirez,* 729 F.2d 1352, 1356 (11th Cir.1984); *United States v. Moody,* 649 F.2d 124, 127 (2d Cir.1981) ("relative degree of embarrassment or indignity"); *United States v. Dorsey,* 641 F.2d 1213, 1217 (7th Cir.1981); *United States v. Wilson,* 636 F.2d 1161, 1163 (8th Cir.1980) and *United States v. Schleis,* 582 F.2d 1166, 1170 (8th Cir.1978) (en banc) (not border searches; not searches of the person); *United States v. Grayson,* 597 F.2d 1225, 1229 (9th Cir.), *cert. denied,* 444 U.S. 875, 100 S.Ct. 157, 62 L.Ed.2d 102 (1979) ("Any invasion was minimal and did not violate the constitutional requirement of reasonableness.").

body-cavity searches. In Braks' case, we are not dealing with either of these two types of searches.[13] Therefore, it is necessary to look to the particular facts of the instant case in order to determine whether the search of Braks came within the broad latitude of a routine border search.

Braks was not required actually to remove any portion of her clothing, nor even to expose herself. After she lifted her skirt, only her undergarments were exposed to view. No physical contact between Braks and the Customs inspectors occurred during the search. Force was not used to effect the search. The search entailed no pain or danger for Braks. The search was conducted in a private room, by female Customs inspectors, and in an overall manner which was not insensitive to the dignity of a human being when confronted with well-grounded concern by lawful authorities at an international border. Nor is our conclusion influenced by the pat-down search that the Customs inspectors contemplated but which never took place.

We do not suggest that the categorization of a border search as routine or nonroutine can be accomplished merely by stacking up and comparing the several factors favoring each of the two classifications. The enumeration above is neither intended to be, nor can it be, an exhaustive list of equally-weighted concerns. Ultimately each case must turn upon its own particularized facts.

We are convinced, however, that the search at issue in the instant case was a permissible border search. Searches quite similar to that which transpired here have been held to be routine searches in other courts. For instance, in *United States v. Wilmot*, 563 F.2d 1298 (9th Cir.1977), the court held that a Customs agent's order to the suspect to drop his pants was a permissible border search. Pat-down searches

have also been held to be routine. *United States v. Oyekan*, 786 F.2d 832, 835 (8th Cir.1986); *United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir.1981).

### The Applicable Standard for This Search

In *United States v. Wardlaw*, 576 F.2d 932 (1st Cir.1978), this court applied the Fifth Circuit's "reasonable suspicion" standard to a search of an individual's person at an international border. The defendants in that case, Wardlaw and Randell, were females who had been traveling companions on a flight arriving at San Juan International Airport. Customs inspectors reasonably became suspicious of the pair upon their arrival. Wardlaw was led to a secondary inspection room and ordered to raise her skirt. Wardlaw refused, and was subsequently ordered to undress. Randell was taken to a different private room and ordered to undress without an intervening demand that she partially expose some portion of her body normally concealed by her clothing. In assessing the standard applicable to "these searches," the court stated:

The standard that has emerged, described by the Fifth Circuit as a "reasonable suspicion" test, *United States v. Afanador*, 567 F.2d 1325, 1328 (1978), requires the Government to demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched. *Id.*, at 1328–29 & n. 4; *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). The quantum of facts necessary to justify a search is related to the degree of the intrusion: "what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or

---

13. We need not appraise Braks' assertion, eloquently made through her counsel, that the "lifting of her dress was a substantial indignity ... even though Customs Inspector Gilman was female[;] lifting a dress to reveal an undergarment would be demeaning to a woman of normal sensibilities." Braks concedes, as she must, that such a search is not equivalent to and is less intrusive than a strip search, as we held in

*United States v. Wardlaw*, 576 F.2d 932, 935 (1st Cir.1978) ("As in [*United States v.*] *Brown* [499 F.2d 829 (7th Cir.1974)], the female inspector asked Wardlaw only to lift her skirt, a less substantial intrusion than a demand to undress fully.") *See also United States v. Palmer*, 575 F.2d 721, 723 (9th Cir.1978), *cert. denied*, 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978).

demeaning search." *Afanador, supra* at 1328.

*Wardlaw* at 934.

■ In the Fifth Circuit the *Afanador* "reasonable suspicion" standard for intrusive searches is applicable only to non-routine searches.[14] This court in *Wardlaw* clearly indicated its purpose to import from the Fifth Circuit the *Afanador* standard. We conclude as well that we intended also to import the limitations upon that standard. Accordingly, we conclude that the "reasonable suspicion" standard applies in the First Circuit to non-routine searches only. *Wardlaw* does not supply the test to determine the standard applicable to routine searches in the First Circuit.

■ The language of this Circuit's cases prior to *Wardlaw* clearly indicates that a standard more relaxed than the "reasonable suspicion" standard applies to routine searches. In *United States v. Stornini*, 443 F.2d 833 (1st Cir.1971), *cert. denied*, 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971), the search at issue was much like this one: a secondary search in which a male individual in a private room was required to lower his trousers to permit "visual inspection of portions of [his] body." *Stornini* at 834. The court did not reach the explicit question of whether that particular search was a routine search or not,[15] but did state with respect to routine searches in general that "[i]t is well settled that a customs officer may search an individual's baggage and outer clothing, in a reasonable manner, based on subjective suspicion alone, or even on a random basis. *Landau v. United States Attorney*, 82 F.2d 285 (2d Cir.1936) [*cert. denied*, 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389]; *Carroll v. United States*, 267 U.S. 132, 154, 45

S.Ct. 280 [285], 69 L.Ed. 543 (1925) (dictum)." *Stornini* at 835. In this context, without expressly deciding so, "subjective suspicion" seems to be the logical equivalent of "no articulable suspicion"; "on a random basis" seems to be the logical equivalent of "no suspicion." These equivalents find support in *United States v. Kallevig*, 534 F.2d 411 (1st Cir.1976), in which a non-routine search was at issue. We there distinguished "routine searches," stating:

> Of course a border search that is less intrusive than a strip search requires *no level of suspicion* on the part of customs officials. "[I]t is too well established to require citation of authority that such searches are unique, that the mere fact that a person is crossing the border is sufficient cause for *a* search. Thus every person crossing our border may be required to disclose the contents of his baggage, and of his vehicle, if he has one. The mere crossing of the border is sufficient cause for such a search." *Henderson v. United States*, 390 F.2d 805, 808 (9th Cir.1967). *See also United States v. Stornini*, 443 F.2d 833, 835 (1st Cir. [1971]), *cert. denied*, 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971).

*Kallevig* at 413 n. 4 (first emphasis added, second emphasis in original).

The First Circuit standard for routine border searches is the "no suspicion" standard.

### By Whatever Name Called, "No Suspicion" Prevails

■ To its inherent soundness the "no suspicion" formulation has the added appeal of simplicity and ease of application

---

**14.** *See Afanador* at 1329 ("We believe the *applicable* standard of 'reasonable suspicion' is met in a *strip search* case [such as this one] where the authorities have received information as detailed as that received in this case...."); *id.* at 1331 ("Only where reasonable suspicion is specifically directed to the individual to be searched, as was the case with appellant Vidal–Garcia, may an *intrusive* search be conducted.") (emphasis added).

For an enumeration of factors entering into the evaluation of whether "reasonable suspi-

cion" exists in those cases in which that standard is applicable, see *United States v. Asbury*, 586 F.2d 973, 976–77 (2d Cir.1978) (applying Fifth Circuit's "reasonable suspicion" standard, instead of Ninth Circuit's "real suspicion" standard, to a strip-search at airport customs station).

**15.** Cocaine was discovered inside the lining of Stornini's overcoat when it slipped from a chair which had held it while he was otherwise occupied.

and has a widespread following.[16] We could speculate that perhaps the several apparently differing standards that other courts have applied to routine border searches simply represent alternative formulations of the "no suspicion" standard that have arisen in an effort to articulate what actually is assumed to occur and in fact does occur in practice. The various decisions by the Courts of Appeals in other circuits have utilized a number of descriptions of the standard to be employed in the field, including "mere suspicion,"[17] "a minimal showing of suspicion,"[18] "no articulable suspicion,"[19] "no particular suspicion,"[20] and "some level of suspicion."[21]

In any event, there is no need either to reconcile the several existing competing formulations or to introduce a new competing formulation of our own. We simply hold that no matter which of these several existing formulations is employed, on the facts of this case the Customs inspectors clearly had sufficient grounds for suspicion to justify the routine search at issue, whether one considers the search as actually conducted or as planned (i.e., a pat-down search). In short, whatever it is that is required, there is more than enough here to support either search.

AFFIRMED.

---

16. *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381, 389 (1985); *United States v. Nieves,* 609 F.2d 642 (2d Cir.1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980); *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir.1967) ("Even 'mere suspicion' is not required.")

17. *See, e.g., United States v. Sandler,* 644 F.2d 1163 (5th Cir.1981); *United States v. Warner,* 441 F.2d 821, 832 (5th Cir.1971), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *United States v. Glaziou,* 402 F.2d 8, 12 (2d Cir.1968), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969); *cf. United States v. Klein,* 522 F.2d 296, 301 (1st Cir.1975) (not a border search); *United States v. Mahoney,* 427 F.2d 658, 660 (9th Cir.1970), *cert. denied,* 400 U.S. 849, 91 S.Ct. 49, 27 L.Ed.2d 87 (search of auto and its occupants).

18. *See, e.g., United States v. Couch,* 688 F.2d 599 (9th Cir.1982).

19. *See, e.g., United States v. Vega–Barvo,* 729 F.2d 1341, 1345 (11th Cir.1984), *citing United States v. Himmelwright,* 551 F.2d 991, 993–94 (5th Cir.1977).

20. *See, e.g., United States v. Sandler,* 644 F.2d 1163, 1168 (5th Cir.1981).

21. *See, e.g., United States v. Couch,* 688 F.2d 599 (9th Cir.1982).