UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 93-2151

 UNITED STATES,

 Appellee,

 v.

 JOSE ROBLES,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Joseph L. Tauro, U.S. District Judge] 

 

 Before

 Selya, Circuit Judge, 

 Campbell, Senior Circuit Judge, 

 and Stahl, Circuit Judge. 

 

Heidi E. Brieger, Assistant United States Attorney, with whom 
Donald K. Stern, United States Attorney, was on brief for appellee. 
John L. Roberts, by appointment of the Court, for appellant. 
 

 January 20, 1995
 

 CAMPBELL, Senior Circuit Judge. Defendant- 

Appellant Jose Robles appeals from his conviction after a

jury trial in the district court and sentence for cocaine-

related offenses. We affirm in all respects.

 I. BACKGROUND I. BACKGROUND

A. Facts A. Facts

 Viewed in the light most favorable to the

government, see United States v. Argencourt, 996 F.2d 1300, 

1303 (1st Cir. 1993), cert. denied, 114 S. Ct. 731 (1994), a 

reasonable jury could have found the following facts. In

February 1992, Robles began working as a houseman at the

Bostonian Hotel in Boston, Massachusetts. During his

employment there, Robles befriended another houseman, co-

defendant Marlio Motta. Motta then resided at 59 Blossom

Street, Chelsea, Massachusetts, but he was a citizen of

Colombia, where his family resided.

 In the fall of 1992, Robles and Motta agreed to

import cocaine from Colombia to Boston by having Motta's

family in Colombia conceal the cocaine within a metal

cylinder and then ship the cylinder to Boston. Around

November 1992, Robles and Motta invited Robles' cousin,

Orlando Figueroa, to 35 Westwind Road, Dorchester,

Massachusetts, an apartment leased by Robles' girlfriend,

Elizabeth Diaz, and occupied, at least occasionally, by

Robles. Robles and Motta asked Figueroa if he would help

 -2-

them retrieve the cylinder by putting his name on the

shipping papers as the consignee. They told Figueroa that

they needed someone like Figueroa with an

identification card in whose name the shipment could be sent.

Robles and Motta told Figueroa that once the cocaine arrived

in the United States, they wanted him to appear at the air

cargo facility at Boston's Logan Airport, show his

identification to Customs officials to prove that he was the

consignee, and then take custody of the package. In return

for his assistance, Robles and Motta offered to pay Figueroa

a total of $10,000. Figueroa agreed to take part as

requested.

 On or about December 10, 1992, the cylinder,

shipped via Challenge Air Cargo from Bogota, Colombia via

Miami, Florida arrived at the Continental Airlines Air Cargo

Facility at Logan Airport, Boston, for a consignee identified

on the shipping documents as "Orlando Figueroa" of 29

Westwind Road, Dorchester, Massachusetts. This was not

Figueroa's address, but rather the address of Jose Robles'

family. The cylinder was contained within a wooden crate.

 At about 1:00 p.m. on December 14, 1992, United

States Customs Senior Inspector Lawrence Campbell, assigned

to the Contraband Enforcement Team, conducted a routine

inspection of the crate at Logan Airport. He noticed that

the crate was coming from a country that he recognized as a

 -3-

source country for narcotics. Campbell also took note that,

according to the Challenge Air Cargo airway bill, the crate

contained a metal machine part stated to be without

commercial value, and shipped without insurance. In

addition, Campbell noticed that the machine part was destined

for a residential, rather than a commercial, address.

Finally, Campbell determined that the shipping costs ($212)

exceeded the declared Customs value ($150) of the item.

 That same afternoon, Motta, Robles, and Figueroa

drove to Logan Airport in Motta's girlfriend's car to pick up

the package. Robles and Figueroa entered the Continental

Airlines terminal at approximately 4:45 p.m., and Robles

inquired of a Continental Airlines employee, Robert Bennett,

about the status of the package. Mr. Bennett told Robles

that the shipment had arrived, but that it was not yet ready

to be released. Mr. Bennett told Robles to return to pick it

up the following day.

 Meanwhile, in light of what he considered to be

suspicious circumstances surrounding the shipment of this

package, Campbell decided to conduct further inspection. The

crate was removed to the Customs Facility at Sealand in South

Boston, Massachusetts in the late afternoon of December 14.

There it was subjected to x-ray testing, which proved

inconclusive. A drug detection dog who sniffed the crate did

not alert to the presence of narcotics. Campbell then

 -4-

manually examined the cylinder by tapping it on both ends,

which sounded solid, and then by tapping it in the middle,

which, he testified, produced a completely different,

"hollow" sound. He then decided to drill into the cylinder

to determine whether there was contraband concealed within.

He first attempted to drill into the ends of the cylinder,

but without success; he stated that the drill was "burning

more than anything else." However, when he attempted to

drill into the center of the cylinder, the drill bit "went

straight through" and emerged covered with a white powdery

substance. A field test of the substance was positive for

the presence of "some sort of opium alkaloid."

 Customs agents then transported the cylinder to a

machine tool shop in Norwood, Massachusetts for further

examination. At approximately 8:00 p.m. on December 14, they

succeeded in drilling a one-inch hole into the center of the

cylinder. Over the next several hours, Customs agents

extracted approximately 2.75 kilograms of cocaine from the

cylinder, finally completing the job at about 1:00 a.m. on

December 15. In addition, they removed a piece of carbon

paper from the cylinder. From experience, they knew that

carbon paper was commonly used by smugglers in order to

interfere with x-ray examinations. They then poured flour

and a small amount of cocaine back into the cylinder, sealed

 -5-

it, repainted it, and repacked it into its shipping crate in

orderto attempt acontrolled delivery1 tothe listed consignee.

 On the morning of December 15, Customs agents

transported the crate containing the cylinder to the

Continental Airlines Air Cargo facility. That same morning,

either Robles or Figueroa contacted a friend, Luis Serrano,

and asked him to drive Robles and Figueroa to the airport to

retrieve a package. Robles, Figueroa, and Serrano arrived at

the Continental terminal at approximately 10:55 a.m. Robles

and Figueroa entered the building, and Robles inquired at the

counter about the status of the package. Mr. Bennett told

Robles that the package would be available for release at

1:00 p.m. that afternoon.

 At approximately 1:20 p.m., Robles, claiming to be

Figueroa, called the Continental Air Cargo facility and asked

to speak with the manager. Special Agent Protentis of the

United States Customs Service, acting in an undercover

capacity, took the phone call. Robles, who again identified

himself as Figueroa, was informed by Protentis that the

package was ready to be picked up. He informed Robles that

Robles was first required to bring the necessary paperwork to

  

1. United States Customs Special Agent Timothy N. Gildea
testified that a controlled delivery "is when we would allow
a package with contraband or a package that had contained
contraband to go to the importer so that we can trace where
the package is going to and try to identify the co-
conspirators."

 -6-

the Customs officials in order to secure the package's

release. Once Customs had cleared the package, he said

Robles should return to the Continental Air Cargo facility

with the paperwork, and then the package would be released to

him.

 Shortly thereafter, Robles called Motta at the

Bostonian Hotel. Motta told Robles to hail a taxi, and, with

Figueroa, pick up Motta at the Bostonian Hotel. Robles did

so. After Robles and Figueroa picked up Motta at the

Bostonian, they took the taxi to the Continental freight

facility at Logan, arriving at about 3:00 p.m.

 Robles and Figueroa entered the facility, leaving

Motta in the taxi. Robles spoke to the Continental

employees. He was told by them what he needed to do to clear

the package through Customs. He and Figueroa then returned

to the cab, which drove them to the Customs Office. At the

Customs Office, Robles and Figueroa obtained clearance for

release of the package, which they then took back to

Continental in the cab.

 Once back inside the Continental freight facility,

Robles arranged with Continental employees for the package to

be brought to the cab. After loading the crate into the cab,

Robles, Motta, and Figueroa left Logan Airport. Customs

Agents intended to seize the crate and the cab's passengers

following a "controlled delivery." However, the agents lost

 -7-

sight of the taxi at some point in the Callahan Tunnel.

Figueroa testified that after leaving Logan Airport the cab

traveled to the rear of 35 Westwind Road, where Robles and

Motta unloaded the crate into the apartment.

 Prior to the shipment of the package, sometime in

December 1992, Motta had asked Jeff MacDonald, an engineer at

the Bostonian Hotel, whether he could borrow a "Sawzall"

power saw from the hotel. MacDonald agreed to lend the saw

to Motta.

 After Robles and Motta unloaded the crate into the

apartment at 35 Westwind Road, they attempted to use the saw

to cut through the cylinder, but were unable to get the saw

to operate properly. Unable to get to the cocaine, Robles,

Motta, and Figueroa left the apartment.

 Also on December 15, Agent Gildea obtained a search

warrant to search for cocaine and drug paraphernalia at 29

Westwind Road, the home of Robles' parents, and the home to

which the crate was addressed. The search was carried out at

approximately 5:30 p.m., but nothing incriminating Robles was

found. On December 17, 1992, following conversations with

Figueroa, law enforcement agents obtained a search warrant

for the premises at 35 Westwind Road. During the execution

of that search warrant on the same day, the agents seized the

crate and the cylinder, which had been placed in a utility

closet on the first floor of the apartment. In addition, the

 -8-

agents found a tool box made of red-painted metal and labeled

with the words "HEAVY-DUTY SAWZALL" in an upstairs utility

closet. Inside the sawzall box was the power saw itself, as

well as an invoice indicating that the owner of the sawzall

was the Bostonian Hotel in Boston, Massachusetts.

 Also on December 17, law enforcement officials

obtained and executed a search warrant for the premises at 59

Blossom Street, Motta's residence. During the execution of

that warrant, law enforcement agents seized Motta's Columbian

passport and other Columbian identification cards; a

Continental Airlines Air Cargo bill for the metal cylinder

shipped from Columbia to Boston; and an address book

containing, among other entries, entries for "Orlando

Figueroa, 29 Westwind Rd., Dorchester, Mass. 02125," and

"Jochy 287-1014" (the telephone number for 29 Westwind Road).

B. Proceedings Below B. Proceedings Below

 Robles was indicted by a federal grand jury on

April 15, 1993. The indictment charged him with conspiracy

to import cocaine, in violation of 21 U.S.C. 963 and

952(a); importation of cocaine and aiding and abetting, in

violation of 21 U.S.C. 952 and 18 U.S.C. 2; conspiracy to

possess cocaine with intent to distribute, in violation of 21

U.S.C. 846; and attempt to possess cocaine with intent to

distribute and aiding and abetting, in violation of 21 U.S.C.

 846 and 18 U.S.C. 2.

 -9-

 On July 27, 1993, the district court denied Robles'

motion in limine seeking to exclude evidence of Robles' prior 

drug activities. In addition, the district court denied

Robles' motions to suppress certain physical evidence. With

respect to the cocaine seized from the cylinder, the court,

without a hearing, ruled that Customs agents had conducted a

routine border search, and accordingly had lawfully searched

the cylinder without a warrant. With respect to the tool box

and power saw seized from 35 Westwind Road, the court, after

a brief hearing, ruled that Robles had standing to challenge

the warrant because his girlfriend lived in the apartment.

However, it also ruled that the tool box and power saw were

lawfully seized because they were in plain view during the

execution of a valid search warrant.

 On July 28, 1993, the court denied Robles' motion

for a judgment of acquittal. On July 30, 1993, after a five-

day trial, the jury convicted Robles on each count of the

indictment, and the court imposed sentence on September 24,

1993. Judgment was entered on October 7, 1993, from which

this appeal was taken.

 II. II.

A. Denial of a Motion to Suppress Evidence Seized as the A. Denial of a Motion to Suppress Evidence Seized as the
Result of a Nonroutine, Warrantless Border Search Result of a Nonroutine, Warrantless Border Search

 Robles contends that the district court erred in

denying his motion to suppress evidence seized as a result of

the drilling search of the metal cylinder. He concedes that

 -10-

Logan Airport was the functional equivalent of an

international border, and that the agents were entitled to

conduct a routine border search of the cylinder without a

warrant, probable cause or any level of suspicion. But

Robles contends that drilling into the cylinder went beyond

the limits of the usual routine border search. To justify

such a nonroutine search, there had to be reasonable

suspicion. Because reasonable suspicion was absent, Robles

continues, the drilling was improper. To hold otherwise, he

urges, would be to subject "international cargo to

destructive searches, in cases without reasonable suspicion

and exigent circumstances, and absent review by an impartial

judicial officer." 

 The government concedes that drilling a hole in the

cylinder was nonroutine. The government also accepts that

damaging border searches of this nature cannot be conducted

except upon a showing of reasonable suspicion. But the

government insists that the suspicious circumstances

surrounding the crate and the enclosed cylinder fully met

that standard. 

 Where, as here, the district court made no findings

of fact with respect to its denial of the motion to suppress,

this court reviews the record de novo. United States v. 

Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993); United States v. 

Sanchez, 943 F.2d 110, 112 (1st Cir. 1991). We are not bound 

 -11-

by the district court's reasoning, and will affirm if the

ruling below is supported by any independently sufficient

ground. Garcia, 983 F.2d at 1167; United States v. 

McLaughlin, 957 F.2d 12, 16 (1st Cir. 1992); United States v. 

Bouffard, 917 F.2d 673, 677 n.7 (1st Cir. 1990). 

 It is well-settled, as the parties all concede,

that routine border searches, conducted for the purposes of

collecting duties and intercepting contraband destined for

the interior of the United States, do not require reasonable

suspicion, probable cause, or a warrant. United States v. 

Montoya de Hernandez, 473 U.S. 531, 537-38 (1985); see also 

United States v. Ramsey, 431 U.S. 606, 616-619 (1977) 

(routine border searches are reasonable within the meaning of

the Fourth Amendment); United States v. Braks, 842 F.2d 509, 

511 (1st Cir. 1988) (routine border searches not subject to

any requirement of reasonable suspicion).

 The rule as to nonroutine border searches is,

however, different. There must be reasonable suspicion

before a search can lawfully be conducted. In the Braks case 

we listed factors used to determine what degree of

invasiveness or intrusiveness would render a border search

nonroutine. These factors include "whether force is used to

effect the search." Braks, 842 F.2d at 512.  

 Drilling into a closed, metal cylinder, as here,

was using "force . . . to effect the search." Id. Cf. 

 -12-

United States v. Chadwick, 532 F.2d 773, 783 (1st Cir. 1976) 

(breaking into locked suitcases), aff'd, 433 U.S. 1 (1977), 

cited in Braks, 842 F.2d at 512 n.9. As Customs Inspector 

Campbell conceded, drilling was "for the most part" unusual,

and "not an everyday occurrence." We have little difficulty

concluding that drilling a hole into the cylinder was not a

routine search.

 Customs agents, as already said, must have a

"reasonable" level of suspicion before conducting such a

nonroutine border search. To satisfy the reasonable

suspicion standard, agents must "demonstrate some objective,

articulable facts that justify the intrusion as to the

particular person and place searched." United States v. 

Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991) 

(citing Braks, 842 F.2d at 513). 

 We agree with the government that this standard was

met here. The shipping documents, which the agents examined,

indicated that the shipment contained a metal machine part of

no commercial value, coming without insurance from Columbia

 a known source country for narcotics to an apparent

residence, rather than to a business. From the documents it

appeared that the shipping cost exceeded the cylinder's

declared value. Tapping the cylinder in the middle produced

a "completely different" hollow sound from the way tapping

the solid ends had sounded, suggesting the presence of a

 -13-

hollow compartment within. Quite obviously, such a

compartment could be used to transport contraband, as proved

to be the case. Given the cylinder's lack of commercial

value, its residential destination, and the fact that to ship

it cost more than its value, the agents reasonably suspected

that the hollow cylinder was not being shipped for its own

sake but rather was being employed to import contraband from

Columbia into this country. The above objective facts, which

the agents learned in the course of their routine preliminary

search, were sufficient to justify the more intrusive search,

by drilling, which the Customs officials then initiated.2

 We affirm the district court's denial of the motion

to suppress evidence derived from the search and seizure of

the cylinder.

B. Denial of a Motion to Suppress Evidence Seized without a B. Denial of a Motion to Suppress Evidence Seized without a
Warrant from a Home Warrant from a Home

 Robles next contends that the denial of his motion

to suppress a tool box and the power saw within items

seized from his girlfriend's home at 35 Westwind Road was

error. Our above holding defeats Robles' first reason

  

2. Robles cites United States v. Cardona-Sandoval, 6 F.3d 15 
(1st Cir. 1993) (involving a destructive, "stem-to-stern"
search of a pleasure craft) in support of his argument that
none of the facts mentioned above were objective facts. We 
disagree. The written statements in the shipping documents,
the country of origin of the cylinder, and the sounds
produced by tapping on the cylinder were all objective, and
were sufficient to raise a reasonable suspicion at the close
of the preliminary routine inspection.

 -14-

offered in support of this claim namely, that since the

warrantless border search which provided probable cause for

the search of the apartment was supposedly illegal, any

evidence seized as a result was "fruit of the poisonous

tree." As just held, the search of the cylinder was not

illegal. Robles further argues, however, that seizure of the

tool box and power saw was illegal because neither item was

mentioned in thewarrant tosearch the 35Westwind Roadpremises.

 The search warrant authorized seizure of (1) a

wooden crate addressed to Figueroa; (2) the cylinder; (3) all

papers relating to the shipping of the crate and the

cylinder; (4) all papers or photographs relating in any way

to the defendants; and (5) all documents evidencing dominion

or control of the premises. Nothing was said as to a tool

box or saw. The government contends, however, that the tool

box, with the saw within, was evidence in "plain view" for

which a warrant was not required.

 Law enforcement agents may seize evidence in plain

view during a lawful search even though the items seized are

not included within the scope of the warrant. Coolidge v. 

New Hampshire, 403 U.S. 443, 465 (1971); United States v. 

Caggiano, 899 F.2d 99, 103 (1st Cir. 1990); United States v. 

Rutkowski, 877 F.2d 139, 140 (1st Cir. 1989). To fall within 

the "plain view" doctrine, a seizure must satisfy two

criteria: first, the officers' presence at the point of

 -15-

discovery must be lawful, and second, the item's evidentiary

value must be immediately apparent to the searchers. United 

States v. Giannetta, 909 F.2d 571, 578 (1st Cir. 1990).3 

 The seizure of the tool box meets these criteria.

The agents were lawfully on the premises at 35 Westwind Road,

pursuant to a valid search warrant. Once there, the agents

were authorized to look within the utility closet (where the

tool box was found) in order to search for papers,

photographs and other documents. As the Supreme Court has

noted:

 A lawful search of fixed premises
 generally extends to the entire area in
 which the object of the search may be
 found and is not limited by the
 possibility that separate acts of entry
 or opening may be required to complete
 the search. Thus, a warrant that
 authorizes an officer to search a home
 for illegal weapons also provides
 authority to open closets, chests,
 drawers, and containers in which the
 weapon might be found.

United States v. Ross, 456 U.S. 798, 820-21 (1982) (footnote 

omitted). Finally, the tool box was labelled on its side

with the words "HEAVY-DUTY SAWZALL." Since the officers knew

that cocaine had been concealed within a heavy metal

cylinder, which must perforce be opened in some manner in

  

3. Courts also historically have required that the discovery
of the item be inadvertent -- i.e., that the searching agents
not suspect in advance that they would find the item.
However, the Supreme Court has stated that "inadvertence" is
not a necessary condition of a plain view seizure. See 
Horton v. California, 496 U.S. 128, 130 (1990). 

 -16-

order to remove the cocaine, the evidentiary value of a saw

capable of performing that task was readily apparent.

 The box was thus properly seized as evidence in

plain view. As Ross, supra, makes clear, there was also no 

unlawfulness in opening the tool box to search its

contents.4 Quite apart from its own evidentiary value, the

box was a possible repository for items mentioned in the

warrant, such as papers, documents and photographs, of which

seizure was authorized. Just as the agents could open

closets, chests, doors and other containers, in order to look

for these, they were authorized to open the box for that

purpose. Once the box was opened, the evidentiary value of

the power saw found within was obvious.

 We find no error in the district court's denial of

Robles' motion to suppress as evidence the tool box and power

saw seized from 35 Westwind Road.

  

4. Texas v. Brown, 460 U.S. 730 (1983), upon which Robles 
relies for the proposition that even if the seizure of the
tool box was lawful, the subsequent search of its contents
was not, is not to the contrary. That case involved the
warrantless seizure of a balloon containing heroin. Justice
Stevens stated that where a movable container is in plain
view, it could be seized without a warrant if there were
probable cause to believe it contained contraband. However,
he continued, once in custody there was no reason to fear
destruction of the evidence, and thus there was no reason to
excuse the inconvenience of obtaining a warrant before
opening the container. Id. at 749-50 (Stevens, J., 
concurring). Here, as we have noted, the officers were armed
with a warrant with authorized them to open a wide variety of
containers in order to search for papers. There was no need
to wait to obtain a separate warrant before opening the tool
box.

 -17-

C. Conclusion C. Conclusion

 Robles challenges certain of the district court's

evidentiary rulings on a variety of other grounds, claiming

unfair prejudice, likelihood of confusion, lack of

authentication and the admission of inadmissible opinion

testimony. Robles also challenges the denial of his motion

in limine to exclude testimony as to prior bad acts; the 

court's jury instructions; the sufficiency of the evidence;

the application of the sentencing guidelines; and the

effectiveness and competence of defense counsel. None of

these claims of error call for extended discussion here. We

have carefully considered each of them and we find them to be

without merit. Affirmed. 

 -18-