**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                                  No. 98-4258

FESTUS OGIE ANTHONY AGUEBOR,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CR-97-428-A)

Submitted: December 15, 1998

Decided: January 4, 1999

Before NIEMEYER and LUTTIG, Circuit Judges, and
HALL, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Dale Warren Dover, Alexandria, Virginia, for Appellant. Helen F.
Fahey, United States Attorney, Keith E. Bell, Special Assistant
United States Attorney, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

**OPINION**

PER CURIAM:

Festus Ogie Anthony Aguebor was convicted on his conditional guilty plea of possession with intent to distribute more than 100 grams of heroin. See 21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(I) (1994). Aguebor conditioned his guilty plea on the ruling of the district court refusing to suppress the heroin that customs officials discovered in Aguebor's alimentary canal after he attempted to enter the United States from Nigeria. In his motion to suppress the evidence, Aguebor claimed that several x-ray images taken of his lower abdomen to effect a search of his alimentary canal violated the Fourth Amendment. The district court disagreed and declined to suppress the evidence. In this appeal, Aguebor assigns error to the district court's ruling. Because we find no merit to Aguebor's contentions, we affirm the criminal conviction.

Aguebor arrived in the United States at Dulles Airport near Washington, D.C. from Nigeria. The customs inspector who initially screened Aguebor for further investigation did so because a computer check revealed that during previous visits to the United States, Aguebor had stayed with his brother, who had been arrested for smuggling heroin. Although a pat-down search was negative, additional investigation raised additional suspicions. The investigating agent considered Aguebor's answers to his inquiries evasive. Aguebor had purchased his airline tickets with cash shortly before the flight into Washington, D.C. He traveled to the United States from Nigeria, a source country for narcotics. Aguebor had previously sent fraudulent passports through the United States mail. Finally, a drug-detecting dog trained to discover internal carriers gave a positive indication for contraband in Aguebor's possession.[1]

At that point, the investigating agents attempted to obtain Aguebor's consent to an x-ray examination of Aguebor's alimentary canal. The agent told Aguebor that if he did not consent to the x-ray examination, he would be detained until a court order authorizing the search

_____

[1] Although Aguebor suggests in his brief that the dog did not give a positive response, that contention is not borne out in the record.

2

could be obtained. On that information, Aguebor consented to the x-ray search. The x-rays taken in a nearby hospital revealed foreign objects in his alimentary canal. Aguebor passed eighty-eight pellets containing heroin a few days later.

Aguebor assigns error to the district court's refusal to suppress the heroin discovered in his lower intestines. The customs officials conducted the search relying on Aguebor's consent. A search may be conducted without probable cause or a search warrant when valid consent is given. See Schneckloth v. Bustamonte , 412 U.S. 218, 222 (1973). In this appeal, as in the district court, Aguebor contends that his consent was not voluntary. The voluntariness of the consent is a factual question which is reviewed by this court only for a finding of clear error. See United States v. Elie, 111 F.3d 1135, 1144 (4th Cir. 1997); United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). To determine whether consent to search is voluntarily given, the district court must examine the totality of the circumstances. See Schneckloth, 412 U.S. at 227. Accordingly, the court must consider the characteristics of the defendant and the circumstances under which the defendant gave consent, and whether the defendant knew that he had a right to refuse consent. See Lattimore, 87 F.3d at 650. A district court commits clear error only when the reviewing court is left with "the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

At the suppression hearing, Aguebor testified that when he initially refused to sign the consent form, the customs agents threatened to arrest him and obtain the x-ray images without his consent. According to Aguebor, that threat evoked images of police brutality and caused him to conclude that at fifty-seven years of age, if he were "rough handle[d]," he might die. That fear, contends Aguebor, compromised the voluntary nature of his consent. However, the testimony of the customs agent who obtained Aguebor's consent differed from Aguebor's recollection. The agent testified that instead of threatening to arrest him, he merely informed Aguebor that if he declined to consent to the examination, he would be detained until such time as a court order could be obtained. The agent further testified that Aguebor did not appear fearful at any point. In determining that Aguebor's consent to the x-ray examination was voluntary, the district court credited the

3

testimony of the customs agent. The decision of the district court of what testimony to credit is not subject to appellate review. See United States v. Saunders, 886 F.2d 56, 60 (4th Cir. 1989). In light of relatively sedate conditions under which the consent to search was given, see Lattimore, 87 F.3d at 650, there is no hint of clear error in the district court's conclusion that Aguebor's consent was voluntary.

Aguebor relies on Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968), to support his position. In that case, the Supreme Court determined that where the consent is obtained by falsely informing the person who is the object of the search that he has "no right to resist the search," the coercion inherent in the situation invalidates the consent. Id. at 550. There is no such coercion in this case. The district court found that customs officials informed Aguebor that if he did not consent, he would be detained until a court order could be obtained authorizing the search. This is a legal and reasonable course of action. As a result, Aguebor's reliance on Bumper, where there was compelling evidence of police misconduct, is unavailing in the absence of similar evidence in this case.

Aguebor also attempts to equate the customs agents' threat of an arrest in this case with "deceitful misrepresentation" which would undermine a finding of valid consent. See Vizbaras v. Prieber, 761 F.2d 1013, 1017 (4th Cir. 1985). The district court found that the agents did not threaten Aguebor with arrest, but rather told him that he would be detained until a court order authorizing the search could be obtained. There was no misrepresentation on the part of the customs agents that would "critically impair" Aguebor's ability to voluntarily consent to the search. See United States v. Pelton, 835 F.2d 1067, 1071-73 (4th Cir. 1987). Because we are not left with the "definite and firm conviction" that the district's court's finding that Aguebor's consent was voluntary was in error, we must also conclude that the x-ray examination was premised on Aguebor's valid consent.

Even if we had found that Aguebor's consent was not valid, that conclusion would not render the district court's ruling on the suppression motion error. Routine border stops and searches may be conducted without probable cause or reasonable articulable suspicion, in order to regulate collection of duties and prevent introduction of contraband. See United States v. Montoya de Hernandez, 473 U.S. 531,

4

537 (1985). Border searches have been considered to be "reasonable" by definition because the person or item in question came into the United States from elsewhere. See United States v. Ramsey, 431 U.S. 606, 619 (1977). There is no question but that the customs agent conducted his initial search of Aguebor's person and baggage in full compliance with the Fourth Amendment.

Following the more pedestrian inspection, the investigating agents eventually subjected Aguebor to multiple x-rays of his lower abdomen. It is at least debatable that this action went beyond the boundaries of a routine inspection. See United States v. Johnson, 991 F.2d 1287, 1293 (7th Cir. 1993) (assuming but not deciding that x-ray examination and removal of inner shell of suitcase was non-routine search). The Supreme Court did not define "routine search" in Montoya de Hernandez. Neither did the Court determine the level of suspicion necessary to conduct an x-ray examination in compliance with the Fourth Amendment. See Montoya de Hernandez, 473 U.S. at 541 n.4. However, only strip searches and body cavity searches have consistently been considered sufficiently intrusive to be non-routine. See United States v. Braks, 842 F.2d 509, 511-13 (1st Cir. 1988); see also United States v. Ramos-Sanez, 36 F.3d 59, 61 (9th Cir. 1994). Neither is involved here, but because a trip to the hospital and a medical procedure were required to continue the search, see Braks, 842 F.2d at 512, we will assume for the purposes of this case that this was something more than a "routine search."

Before the agent could initiate a non-routine search, a reasonable suspicion was required. See United States v. Oriakhi, 57 F.3d 1290, 1297 (4th Cir. 1995). The non-routine search of Aguebor would be justified when the customs agents, considering all the facts, "reasonably suspect[ed]" that Aguebor was smuggling contraband in his alimentary canal. See Montoya de Hernandez, 473 U.S. at 541.[2] Even

_____

[2] Aguebor cites two cases from the Ninth Circuit decided before Montoya de Hernandez for the proposition that a "clear indication" or "plain suggestion" is required to carry out an x-ray examination. See United States v. Quintero-Castro, 705 F.2d 1099, 1100 (9th Cir. 1983); United States v. Ek, 676 F.2d 379, 382 (9th Cir. 1982). The Supreme Court in Montoya de Hernandez flatly rejected the "clear indication" standard, declining to create verbal gradation under the Fourth Amendment. See Montoya de Hernandez, 473 U.S. at 540-41.

5

assuming that the x-ray examination was a non-routine search, the district court did not err in concluding that the customs agent had reasonable suspicion to support the more intrusive search. As noted above, Aguebor purchased his ticket with cash shortly before his departure. He traveled from Nigeria, a source country and reported that he was visiting his brother who had been arrested for smuggling heroin. Aguebor had previously mailed fraudulent passports to individuals in the United States. Finally, the narcotics search dog gave a positive response when searching Aguebor. In light of the fact that a search of Aguebor's person did not reveal narcotics, the conclusion that Aguebor was carrying the drugs internally was reasonable. The combination of these factors easily reach the threshold of a reasonable suspicion supporting the x-ray examination. There was no violation of the Fourth Amendment in the customs agents' actions effecting the search and no error in the district court's decision not to suppress the fruits of that search.**3**

Finding no merit to either of Aguebor's contentions on appeal, we affirm his conviction. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.

AFFIRMED
_____

**3** In his briefs, Aguebor suggests, somewhat obliquely, that the manner in which the x-ray examination was conducted and the course of treatment followed by attending physicians upon the discovery of foreign objects in Aguebor's alimentary canal somehow rendered the search unreasonable. Although Aguebor chronicles the difficulties he experienced with his diabetes during his hospital stay, there is no evidence of record that would suggest that the officials' actions caused the variation in his blood sugar level. While Aguebor notes that there is no evidence that the laxative he received in the hospital was administered voluntarily, neither is there evidence that the medication was forced on him. See United States v. Saldarriaga-Marin, 734 F.2d 1425, 1428 (11th Cir. 1984). As a result, the care given to Aguebor as officials waited for the deadly heroin to pass safely through his body did not render the otherwise legal search of his person unreasonable.